**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION**

**LEVEL 3 COMMUNICATIONS, LLC,**

        **Plaintiff**

**v.**

**MICHAEL R. FLOYD, d/b/a FLOYD &
FLOYD CONTRACTORS,**

        **Defendant.**

**Case No.: 1:09-cv-0082
JURY DEMAND (12)**

**Judge Trauger**

**PLAINTIFF'S RESPONSE TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Level 3 Communications, LLC ("Level 3") submits this memorandum in opposition to motion of Defendant Michael R. Floyd, d/b/a Floyd & Floyd Contractors ("Floyd") for summary judgment (Docket Entry ("D.E.") 27).

## INTRODUCTION

On August 15, 2007, Floyd struck and damaged Level 3's underground conduit bank and the fiber-optic telecommunications cable (the "Cable") which ran inside one of those conduits while excavating with a trackhoe. This was despite that fact that **on the previous day**, Level 3 had marked the location of that cable in accordance with Tennessee law and secured Floyd's promise that Floyd would not excavate over the Cable until Level 3 had the opportunity to protect it.

On August 15, Level 3 met with Floyd to assess the damage. Level 3 informed Floyd that while this damage had fortunately not impacted the Cable's ability to carry traffic, Level 3 would, nonetheless, have to repair the conduits and the Cable. Level 3 also requested that Floyd not perform any additional excavation over the Cable until that was done. Floyd agreed.

Despite this promise, on August 16, 2007, **the very next day**, Floyd again excavated directly over the Cable and damaged it further. As a result, Level 3 lost the use of a portion of the

Cable. A number of Level 3 customers had their service completely interrupted or "down hard" for a significant period of time until Level 3 was able to reroute and restore their traffic. These customers included other telecommunications providers, cellular telephone service providers, internet service providers, satellite and cable television service providers, internet search engines, and the University of Memphis.

As a result of Floyd's actions, Level 3 suffered actual damages of $345,906.83, consisting of: (1) repair costs of $45,483.07; and (2) $300,423.76 for the loss of the use of the Cable. Level 3 has measured its loss of use damages by the cost to obtain capacity from another carrier sufficient to replace the capacity of only those transport systems that were active, traffic, and completely interrupted or down hard, i.e., the rental cost of substitute or replacement property for the time it took Level 3 to reroute and restore that traffic to the point it was no longer visibly impacted.

## FACTUAL BACKGROUND

### I.  LIABILITY

Floyd does not dispute that he struck and damaged Level 3's conduit bank and the Cable on August 15, 2007. Even were the Cable not damaged, Floyd's conduct required Level 3 to repair the conduit bank and thus incur the repair costs it is seeking. Unfortunately, Floyd also damaged the Cable.

The crux of Floyd's motion for summary judgment is that he should not be liable for the loss of use damages Level 3 seeks because there is purportedly no evidence that the damage Floyd admittedly inflicted on August 15, 2007 was sufficient to interrupt traffic or cause Level 3 to lose the use of that Cable. Contrary to Floyd's claims, as set forth in Level 3's Response to Floyd's Statement of Material Facts (which Level 3 incorporates by reference herein pursuant to Fed. R.

Civ. P. 10(c)),[1] Level 3 has submitted ample evidence from which a jury could conclude that the damage Floyd inflicted on August 15, 2007 could, indeed, cause the Cable to deteriorate over the next day and lose its ability to carry traffic. Level 3 has also submitted evidence from which a jury could reasonably conclude that Floyd struck the Cable again on August 16, 2007 and exacerbated the damages that Floyd caused the previous day.

## II.    THE CABLE FLOYD DAMAGED

A fiber-optic cable is essentially a "pipeline" that carries telecommunications traffic between various points in a telecommunications carrier's network known as terminals. It consists of individual strands of glass or "fibers" which are connected to electronic equipment in the terminals. The capacity of a fiber-optic cable is measured by a unit known as a "DS-3."[2] The Federal Communications Commission ("FCC") has described the DS-3 as "a communications highway," put in place to provide services essential to Homeland Security and our Nation's economy by carrying traffic ranging from simple alarm and control circuits to voice circuits, to radio and television programs, to circuits carrying ATM or credit card transactions, to FAA flight control circuits, to Department of Defense circuits, to transferring billions of dollars from one Federal Reserve Bank to another, and to circuits critical to the operation of the stock and bond markets. FCC Order (Ex. A) at ¶¶ 8, 127, 136. These telecommunications services are essential to the operation of virtually all government, business and critical infrastructures throughout the United States as well as our Nation's economy. Id. at ¶ 11.

---

[1] References in this Response to the evidence set forth in Level 3's Statement of Additional Material Facts Precluding Summary Judgment for Defendant are denoted as "L3F, ¶ __".

[2] A DS-3 is an electrical circuit which has a bit stream or data rate of approximately 44.7 megabits per second. One DS-3 is the equivalent of 672 individual phone calls. The DS-3 is the common denominator used throughout the telecommunications industry as a measure of capacity. MCI v. Patriot Engineering and Environmental, Inc., 487 F. Supp. 2d 1029, 1032 (S.D. Ind. 2007); MCI WorldCom Network Services, Inc. v. Pelcrete Constr. Inc., 2006 WL 1388490 at 2 n.1 (S.D.N.Y. May 8, 2006); In re New Part 4 of the Commission's Rules Concerning Disruptions to Communications, FCC 04-188, ET Docket No. 04-35, Report and Order (Aug. 19, 2004) ("FCC Order") (relevant portions attached as Ex. A) ¶ 128.

### III. THE IMPACT OF FLOYD'S DAMAGE TO THE CABLE

The damage Floyd inflicted on the Cable on August 15 and/or 16, 2007, had a significant impact both on Level 3 and the public. While Level 3 was able to automatically reroute a portion of traffic from the damaged Cable to dedicated, spare restoration capacity on other cables in Level 3's own network which was reserved exclusively for use in emergencies situations such as cable cuts, a significant amount of traffic was completely interrupted or down hard until Level 3 was able to manually reroute and restore it. L3F, ¶¶ 40-41, 46-48. Moreover, even the traffic Level 3 was able to reroute was impacted. Level 3's customers no longer had the back-up security they had been promised. That traffic was at risk of being completely lost if Level 3 suffered a cut on the restoration path before the Cable was repaired. L3F, ¶ 49.[3]

### IV. THE NEED FOR LEVEL 3 TO PROTECT THE PUBLIC WITH ITS OWN DEDICATED SPARE RESTORATION CAPACITY

Congress has found that unintentional damage to underground facilities during excavation is a significant cause of disruptions in telecommunications and other vital public services such as hospitals and air traffic control operations. MCI WORLDCOM Network Services, Inc. v. Big John's Sewer Contractors, Inc., 2003 WL 22532804 (N.D. Ill. Nov. 7, 2003); Pub. L. 105-178, Title VII, § 7301, June 9, 1998, 112 Stat. 477, 49 U.S.C.A. § 6101, Historical and Statutory Notes. Excavation damage is, in fact, the single largest cause of interruptions to fiber cable service. L3F, ¶¶ 28, 30-31.

Network reliability data compiled since 1993 shows that more than half of all facility outages are the result of excavation damage. An FAA study of cable cuts in 1993 documented 1,444 equipment outages or communications service disruptions resulting from 590 cable cuts

---

[3] The FCC has analogized this circumstance to a twin-engine airplane which can still fly with one engine. "If one engine fails, the second (protection) engine keeps the plane flying but in an impaired state. Service is not restored to normal until both engines operate properly. Protected communications services are not restored to normal until both the primary and protect DS3s operate properly." FCC Order (Ex. A) at ¶ 134.

nationwide over a two-year period. The majority of cable cuts were related to construction and excavation activities. In 1995, cable cuts affected 32 air traffic control facilities, including five en route control centers. Cable cuts for the first 8 months of 1997 affected air traffic control operations for a total of 158 hours. L3F, ¶ 31.

A study performed by the Telecommunications Industry Benchmarking Consortium ("TIBC") at the behest of the FCC found that it is often less expensive for an excavator simply to dig up telecommunications facilities and pay the price than it is to excavate safely. L3F, ¶ 32. This study concluded that third-party damage to underground utilities will not be significantly reduced until the fundamental economics are changed and that certain excavators under pressure to earn a profit will continue to dig up facilities if it is the least expensive course of action open to them. L3F, ¶ 33.

The record here evidences the prescience of these studies. Level 3 marked the location of Cable in accordance with Tennessee law before Floyd began digging and, **on two successive days**, secured Floyd's promise that it would not dig over the Cable until Level 3 could protect it. L3F, ¶¶ 10-13, 16. Despite this, Floyd struck and damaged the conduit bank and the Cable, **not once, but twice**. L3F, ¶¶ 10-14, 16, 18-24.

## V.     THE COST OF LEVEL 3'S DEDICATED SPARE RESTORATION CAPACITY

Level 3 was, after approximately 2.9 hours, able reroute all traffic from the damaged portion of the Cable to dedicated, spare restoration capacity on other cables in Level 3's network and to undamaged fibers in this Cable which Level 3 reserved exclusively for use in emergencies. L3F, ¶¶ 40, 46-48. Level 3 was able to do this only because Level 3 had, prior to the damage, and at a cost of millions of dollars, obtained that dedicated, spare restoration capacity. L3F, ¶¶ 34-36.

5

## VI.     LEVEL 3'S LOSS OF USE CALCULATION

Level 3 has based its loss of use damages on the cost of obtaining comparable capacity from another carrier sufficient to replace the 4,032 DS-3s of capacity of the transport systems that were: (i) active; (ii) carrying traffic; and (iii) completely interrupted and impacted, when Floyd damaged the Cable.  In other words, Level 3 based its loss of use damages on the cost of renting substitute or replacement property.   L3F, ¶ 43.    This is the same methodology used throughout the telecommunications industry to calculate loss of use damages.  L3F, ¶ 50.  It is a also methodology courts have found provides a reasonable basis for calculating damages for loss of use of a telecommunications cable.[4]  Most importantly, as set forth below, it is a proper methodology for measuring damages for the loss of use of property under Tennessee law.

## ARGUMENTS AND AUTHORITIES

## I.     FLOYD'S BURDEN OF PROOF

As the moving party, Floyd has the burden of identifying the basis of its motion and demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Dobrowski v. Jay Dee Contractors, Inc., 571 F.3d 551, 554 (6th Cir. 2009).  The Court cannot weigh evidence or make credibility determinations on summary judgment.  See Doe v. Metropolitan Nashville Pub. Schs., 133 F.3d 384, 387 (6th Cir. 1998).  Rather, the Court must view the evidence in the light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists.  Adickes v. Kress, 398 U.S. 144, 157 (1970).  Summary judgment is not appropriate where, as here, a reasonable jury could return a verdict for the nonmovant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

---

[4] E.g., MCI WORLDCOM Network Services, Inc. v. Atlas Excavating, Inc., 2006 WL 3542332 at 5-9 (N.D. Ill. Dec. 6, 2006); Pelcrete, 2006 WL 1388490 at 1-2; MCI WORLDCOM Network Services, Inc. v. Kramer Tree Specialists, Inc., 2003 WL 22139791 at 1-2 (N.D. Ill. Aug. 15, 2003) ("Kramer II").

6

## II. GENUINE ISSUES OF MATERIAL FACT REGARDING THE DAMAGE FLOYD INFLICTED ON THE CABLE PRECLUDE SUMMARY JUDGMENT

### A. There Is A Genuine Issue Of Material Fact Regarding How And When Floyd Damaged Level 3's Cable

Floyd admits that he struck and damaged Level 3's conduit bank containing the Cable with a trackhoe on August 15, 2007. Defendant's Statement of Material Facts (D.E. 28), at ¶ 11; L3F ¶ 14. Floyd nonetheless argues that because traffic on the Cable did not exhibit the effects of that damage until August 16, Floyd cannot be held responsible for the damage. Floyd is mistaken. Floyd's position fails to take into account the material properties of fiber-optic cable and ignores the clear causal link between the damage Floyd inflicted on the Cable and its repercussions on Level 3's network.

A fiber-optic cable is made up of hair-thin, individual strands of glass fibers which are used to transmit information as pulses of light. L3F, ¶ 17. The Cable here contained 96 individual fibers grouped into eight buffer tubes. Id. The buffer tubes are in turn sheathed in fiberglass padding and jacketed in two layers of plastic and one layer of metal armoring. Id. Exerting significant pressure on the Cable (such as the force of a trackhoe striking the Cable) can fracture or shatter the glass, preventing the fiber from transmitting light and triggering alarms on Level 3's systems. Id. Level 3 has submitted evidence indicating that the damage the Cable suffered when Floyd struck it on August 15, 2007 could have fractured glass in the Cable and caused subsequent degradation and loss of signal on the Cable on August 16, 2007. L3F, ¶¶ 14-20, 22-26.

Level 3's employee, Al Hannah, inspected the damage inflicted by Floyd on August 15 and observed that the conduit containing the Cable had been "badly kinked" by the impact of Floyd's trackhoe. L3F, ¶ 14. He informed Floyd that all work in the area must cease to permit Level 3 to repair the damage. L3F, ¶ 16. Hannah testified that based on his experience, an impact like that

7

caused by Floyd on August 15 could shatter glass in the Cable and cause degradation in signal over time as the glass continues to fracture further.  L3F, ¶¶ 17, 24.

When alarms sounded on August 16, 2007, Level 3 personnel used electronic testing equipment to pinpoint the exact location of the damage to the Cable.  L3F, ¶¶ 18-19.  Level 3's electronic equipment identified precisely the point where Floyd struck the Cable on August 15 as the cause of the interruption in service.  L3F, ¶¶ 19, 22, 25.  Indeed, once Level 3 personnel replaced the short section of cable that Floyd struck, traffic was restored on all systems riding the Cable.  L3F, ¶ 25.

The nature in which traffic dropped also indicated that the cause of the interruption in service was not a complete severance of the Cable, but a partial or incomplete destruction of glass fibers.  Systems riding the Cable did not all drop at once, as would have been the case had the Cable been severed.  Rather, errors arose intermittently and gradually until the interruptions became so severe that light could no longer pass on certain systems.  L3F, ¶¶ 18, 20.  The evidence indicates that the source of the interruption to Level 3's network was Floyd's striking the Cable with its trackhoe on August 15, regardless of the delay in degradation to traffic that followed the strike.

Finally, there is evidence that Floyd continued working near the Cable even after Floyd again promised Level 3 that it would stop working after striking the Cable on August 15.  L3F, ¶¶ 23-24.  When Hannah left the site on August 15, the conduit bank was exposed but supported by earth and rock beneath the lines.  L3F, ¶ 16.  However, when Level 3 crews returned after alarms sounded on August 16 indicating interruption of traffic on the Cable, they discovered that the earth and rock supporting the Cable had been removed, that no one besides Floyd was working in the area, and that the ditch Floyd had been excavating on August 15 to install a water line had been extended.  L3F, ¶¶ 23-24.  At the very least, there is evidence from which a reasonable jury could conclude that Floyd performed additional work after striking the Cable on

August 15 and that this additional work, particularly the removal of support, resulted in further damage to the Cable.

There is ample evidence from which a jury could determine that Floyd caused the damages Level 3 suffered when Floyd admittedly kinked the conduit bank containing the Cable on August 15 or when Floyd continued working around the Cable on August 16, 2007. The question of what caused Level 3's damages is, at a minimum, a disputed question of material fact, thus precluding summary judgment in Floyd's favor.

**B.** **There Is A Genuine Issue Of Material Fact Regarding Level 3's Purported Role In Damaging The Cable**

Floyd has also claimed that the Cable was damaged when Level 3 and its contractors initiated repairs. However, Floyd's position is at odds with the evidence and common sense. Floyd cites a Level 3 internal report drafted by Jeff North in support of its position. However, North was not present when alarms first sounded and when repairs were initiated. Level 3's Response to Defendant's Statement of Material Facts, ¶ 23. North testified that his report was based on secondhand knowledge gleaned from speaking with Level 3 personnel in the field, including Allan Hannah and Dennis Wuest. Id. North himself acknowledges that his memory of events is fuzzy and that the accounts provided by Hannah and Wuest, based on their actual observations in the field, are likely to be more accurate. Id.

As amply demonstrated by Hannah's testimony, Level 3's employee who was actually present at the site, Level 3 attempted no repairs on August 15 after initially discovering the damage Floyd caused to the conduit bank. L3F, ¶¶ 16, 18. After discovering the initial damage Floyd caused on August 15, Hannah informed Floyd's employees that Level 3 would repair the Cable at a later time. L3F, ¶ 16. On August 16, 2007 at 17:24 GMT (12:24 Central), alarms sounded indicating dropping traffic on systems riding the Cable Floyd damaged. L3F, ¶ 18. Level 3 did not

dispatch personnel or contractors to the site of the interruption until approximately 4 p.m. Central time, several hours after alarms first sounded.  L3F, ¶¶ 18-22.  It is logically impossible that Level 3 or its contractors caused damage to the Cable during repairs which began hours after alarms signaled the need to initiate repairs.  North's account, which he himself has stated lacks credibility, is simply misguided, and consequently, so is Floyd's account upon which it is based.  It is clear that the only party present when Level 3's Cable was damaged was Floyd and that Floyd's negligence is responsible for the damages inflicted on Level 3's Cable.  At a minimum, there is a vigorously disputed question of fact regarding how Level 3's Cable was damaged and when.  Summary judgment is wholly inappropriate in the face of such factual disputes.

**III.**   **FLOYD HAS PRESENTED TESTIMONY FROM A PURPORTED EXPERT WITNESS WHICH LACKS RELIABILITY OR RELEVANCE AND MUST BE DISREGARDED**

Floyd has presented an affidavit in support of its position that its admitted impact with Cable on August 15 did not cause the disruption of traffic on the Cable on August 16.  See Affid. of Richard F. Haglund, attached to Defendant's Brief in Support of His Motion (D.E. 29) as Ex. H.  However, as is more fully set forth in the concurrently-filed Motion to Exclude Certain Evidence, Testimony and Opinions From Richard Haglund (D.E. 33) and Brief in Support (D.E. 34), Haglund is not an expert on damage to, or repair of, fiber-optic cables.  Id. at 5-8.  Even if Haglund had some expertise in evaluating damage to fiber-optic telecommunication cables, which he does not, he has not conducted any scientific tests on the section of cable Floyd damaged to determine whether the glass was crushed or could still pass light.  Id. at 6.  In fact, the only examination Haglund made of the Cable lasted less than 15 minutes and consisted only in a visual inspection of the outer plastic sheath surrounding the interior glass fibers.  Id.  Haglund's testimony regarding the cause of Level 3's interruption in service lacks any reliability or relevance.  See Nelson v. Tennessee Gas Pipeline Co., 243 F.3d 244, 251 (6th Cir. 2001); Smelser v. Norfolk Southern Ry., 105 F.3d 299, 303 (6th

Cir. 1997). Haglund's testimony in support of Floyd's Motion must be disregarded by this Court in evaluating the Motion. All of the competent evidence establishes that Floyd striking the conduit containing the Cable with a trackhoe caused the interruption to Level 3's network. At the very least, contested issues of fact regarding causation render this case unfit for disposition by summary judgment.

## IV.   THE METHODOLOGY LEVEL 3 HAS USED TO MEASURE ITS LOSS OF USE DAMAGE IS PROPER UNDER TENNESSEE LAW

### A.   The Rental Value Of Substitute Property Is A Proper Measure Of Level 3's Loss Of Use Damages

Where the property is capable of being repaired, the proper measure of damages is the reasonable cost of repairs **plus** any loss of use pending the repairs. Perkins v. Brown, 177 S.W. 1158, 1159 (Tenn. 1915); Tire Shredders, Inc. v. ERM-North Central, Inc., 15 S.W.2d 849, 853-55 (Tenn. App. 1999); T.P.I.-Civil 14.40 Damage to Personal Property (2010). The measure of loss of use damages is reasonable compensation to the plaintiff to the plaintiff for being deprived of the use of the property. The reasonable rental cost of such property for that period of time and the use, or lack of use, the plaintiff would have made of the property except for the incident is a factor for determining that amount. Tire Shredders, 15 S.W.2d at 855; T.P.I.-Civil 14.43 Loss of Use (2010). Level 3 has submitted here evidence that it was able to repair the Cable Floyd damaged. L3F, ¶¶ 22, 25, 40. The rental cost of substitute property is, therefore, a proper measure of Level 3's loss of use damages.

### B.   Level 3 Is Entitled To Loss Of Use Damages Regardless Of Whether It Procured Substitute Capacity From A Third Party After Floyd Damaged The Cable

Floyd claims that Level 3 is not entitled to loss of use damages because the purportedly undisputed facts allegedly "establish" that Level 3 "never actually rented replacement property… ." Floyd Memorandum (D.E. 29) at 10. This claim fails on two levels. First, Tennessee law does not

require Level 3 to obtain substitute capacity from another carrier before being entitled to damages for its loss of the use of the Cable. Second, and perhaps more importantly, Level 3 spent millions of dollars for the substitute capacity it used to reroute traffic from the Cable when Floyd severed it.

**1. Tennessee Law Does Not Require Level 3 To Obtain Substitute Capacity From A Third Party**

Contrary to Floyd's assertion, Tennessee law does not require a plaintiff to actually incur out-of-pocket costs to replace the property. E.g., Perkins, 177 S.W. at 1159; Tinker v. Wix Corp., 1986 WL 4757 at * 3 (Tenn. App. 1986). In Perkins, the defendant argued that the plaintiff should not be allowed to recover loss of use damages because the plaintiff did not actually expend money in hiring a substitute car. The Tennessee Supreme Court, relying on cases involving a dredger and a lightship, resoundingly rejected this argument, calling it "not tenable." 177 S.W. at 1159.

In Tinker, the plaintiff sought damages for the loss of the use of her car which had been damaged when the oil filter the defendant manufactured failed to properly circulate oil through the engine of the plaintiff's car. 1986 WL 4757 at * 1. The plaintiff testified she did not rent a replacement vehicle or compensate her friends or family for rides they provided during the 22 days her car was in the shop. The Tennessee Court of Appeals characterized the issue before it thusly: "Must a plaintiff incur out of pocket expenses before she can collect for lack of use of an automobile?" Id. at *3. The Court, quoting Perkins, held that proof of the actual rental substitute automobile was not required. Id.[5]

**2. Level 3 Incurred Substantial Costs For Substitute Capacity Which It Reserves Exclusively For Use In Emergencies**

Level 3 has submitted evidence showing that it spent millions of dollars to obtain the dedicated, spare restoration capacity it used to reroute traffic from the damaged portion of the

---

[5] The Court did, however, go on to hold that some proof as to the value of the use for the period of time was necessary and denied the plaintiff loss of use damages because she did not introduce any such evidence at trial. Id. Here, Level 3 has offered evidence of the value of the use of the portion of the Cable Floyd damaged.

Cable. L3F, ¶¶ 34-36. The fact that Level 3 incurred those costs before, rather than after, Floyd damage the Cable makes no difference.

In Brooklyn Eastern Dist. Terminal v. United States, 287 U.S. 170 (1932), the Court stated that where the nature of the business was such that a party needed to keep a spare available to avoid a loss, the fair value of hiring a substitute could be an element of damage, regardless of whether the substitute was actually hired. Id. at 174-75. The Court further stated that where a shipowner did, in fact, maintain a spare boat which it kept in reserve to use as a substitute if another of its vessels was damaged, it was entitled to loss of use damages. This was true regardless of whether the shipowner procured the spare boat after the event, or simply used one he had acquired and maintained as a spare prior to the incident:

> Shipowners at times maintain an extra or spare boat which is kept in reserve for the purpose of being utilized as a substitute in the contingency of damage to other vessels of the fleet. There are decisions to the effect that in such conditions the value of the use of the boat thus specially reserved may be part of the demurrage. If no such boat had been maintained, another might have been hired, and the hire charged as an expense. **The result is all one whether the substitute is acquired before the event or after**.

Id. at 176-77 (citations omitted) (emphasis added).

Level 3 has submitted here evidence showing that the nature of its business is such that it needs dedicated spare cables and/or capacity to protect the public and to avoid a loss of revenue if one of its cables is damaged. L3F, ¶¶ 34-35. Level 3 has also submitted evidence showing that it reserved this spare capacity exclusively for use in emergencies and does not use it for the general purposes of its business. Id. at ¶¶ 35-36. These are precisely the facts the Brooklyn Eastern Court found would allow loss of use damages based on the cost of hiring a substitute. It thus makes no difference that Level 3 built or obtained the replacement capacity before, rather than waiting until after, Floyd damaged the Cable. See Brooklyn Eastern, 287 U.S. at 176-77; cf. Sprint Communications Co. v. Western Innovations, Inc., 618 F. Supp. 2d 1101, 1119 (D. Ariz. 2009)

13

("[H]aving pre-obtained an emergency back-up was no bar to recovery of loss of use damages.");[6]

Level 3 Communications, LLC v. Toomer Elec. Co., 557 F. Supp. 2d 745, 747 (E.D. La. 2008)

(refusing to allow the defendant to reduce its own liability by relying upon the increased level of

preparedness in which the plaintiff chose to invest for its business); Atlas, 2006 WL 3542332 at 6-

9;[7] Kramer II, 2003 WL 22139791 at 2 ("MCI should not be penalized for having a separate

infrastructure in place to respond to emergency situations. Therefore, MCI was not required to seek

substitute DS-3 capacity to recover loss of use damages.").[8]

Tennessee law thus does not require Level 3 to have incurred costs to obtain substitute

capacity from another carrier after Floyd damaged the Cable to be entitled to loss of use damages.

Moreover, the evidence shows that Level 3 did, in fact, expend millions of dollars to obtain the

substitute capacity it used to restore traffic here. Floyd's claim that Level 3 cannot recover loss of

use damages because it did not incur any costs to obtain substitute capacity should therefore be

rejected.

---

[6] In Western, Sprint sought to measure its loss of use damages by the rental cost of a replacement cable or capacity even though it did not incur any costs to rent substitute capacity on another carrier's cable while it repaired the cable the defendants damaged. The defendants sought summary judgment that Sprint was not entitled loss of use damages because Sprint rerouted traffic through other cables in its own network and did not suffer any interruption in service. The Court held that the rental cost of replacement capacity was the appropriate measure of Sprint's loss of use damages and that Sprint would be entitled to such damages as long as it could show that it reserved the capacity to which it rerouted traffic for use in emergencies. 618 F. Supp. 2d at 1119-20.

[7] In Atlas, MCI sought loss of use damages based on the cost of leasing substitute capacity from another carrier even though it had rerouted traffic to other cables and capacity in its own network. The defendant argued that because MCI was not forced to rent alternative capacity from another carrier, awarding loss of use damages would result in an improper windfall to MCI. 2006 WL 3542332 at 6. The defendant further argued that even if MCI were entitled to recover loss of use damages, the rental value of a substitute cable or capacity was not the proper measure of those damages. Id. at 8. As Level 3 has done here, MCI submitted evidence that it used the redundant capacity to which it rerouted traffic following the severance of the cable for emergency purposes only, and not in its general business. Id. at 7. The Court held that MCI's redundant capacity had inherent value of its own – a guarantee of seamless service in the event of an emergency. The Court then held that MCI was entitled to recover loss of use damages based on the reasonable rental cost to replace the active capacity of the cable Atlas severed. Id. at 9.

[8] In Kramer, Level 3 sought loss of use damages based on the cost of leasing capacity from another carrier. The defendant sought summary judgment that Level 3 was not entitled to loss of use damages because it did not actually lease substitute capacity and offered no evidence of lost revenue or business. The Court denied the defendant's motion, holding that the measure of damages was the reasonable rental value of similar property for the period of deprivation and that Level 3 was not required to actually lease substitute capacity or show a loss of revenue or business to recover loss of use damages. MCI WORLDCOM Network Services, Inc. v. Kramer Tree Specialists, Inc., 2003 WL 22139794 at 2 (N.D. Ill. June 19, 2003) ("Kramer I").

## C.     Tennessee Law Does Not Require Level 3 To Show Lost Profits

Floyd argues that Level 3 is not entitled to loss of use damages because it did not suffer any lost profits and that allowing such damages would therefore constitute a "windfall" to Level 3. Floyd Memorandum (D.E. 29), at 10-19. Floyd's argument is contrary to Tennessee law. It would also result in a windfall to Floyd by unfairly allowing Floyd to escape liability based on the millions of dollars Level 3 invested to protect the public from tortfeasors like Floyd.

In Perkins, the defendant argued that the plaintiff was not entitled to loss of use damages because she used the vehicle the defendant had damaged for recreation or luxury and not for a profit. The Tennessee Supreme Court rejected this argument: "Nor may it be held, under the authorities, that the right to recover substantial damages, as distinguished from nominal damages, depends upon the precedent use of the car for profit. Compensation for injury being the rule, there can be no just reason for the allowance of the usable value in the one case and its disallowance in the other." 177 S.W. at 1159.

Floyd cites Scott v. Houston, 2010 Tenn. App. LEXIS 153, 22-23 (Tenn. App. Feb. 26, 2010) and Tire Shredders, and claims that these subsequent decisions have limited Perkins. Even if Floyd were correct, the purported "limitations" in those cases are not applicable here.

In Scott, the plaintiff argued that the trial court erred in refusing to award her damages for the loss of the use of a car for all seven days of the week, even though her testimony showed that she only drove the car on Sundays. Affirming the trial court, the Court of Appeals held that the plaintiff was not damaged when the car was simply sitting idle in her driveway. 2010 Tenn. App. LEXIS 153 at 22-23. In this case, however, Level 3 was actively using the Cable when Floyd damaged it and seeks loss of use damages only for the time Floyd precluded it from doing so. L3F ¶¶ 43, 47-48.

15

In the language Floyd quotes, and in fact emphasizes, from <u>Tire Shredders</u>, the Court was discussing the rule which precludes loss of use damages where the property is totally destroyed and/or the plaintiff does not repair it. Floyd's reliance on <u>Tire Shredders</u> is misplaced. Here, the Cable was not totally destroyed and Level 3 did repair it. L3F, ¶¶ 25, 40.

Finally, Floyd quotes from the U.S. Supreme Court's decision in <u>Brooklyn Eastern</u> and claims that the U.S. Supreme Court reviewed <u>Perkins</u> and purportedly confirmed the limitations Floyd urges. In fact, Floyd's argument is completely opposite of the reason for which the <u>Brooklyn Eastern</u> Court actually cited <u>Perkins</u>.

In language Floyd quotes from <u>Brooklyn Eastern</u>, the Court was actually discussing situations in which a plaintiff could recover loss of use damages based on the rental value of a substitute regardless of whether the plaintiff actually procured a substitute:

> The vessel may have been employed in a business of such a nature that for the avoidance of loss there is need of the employment of a substitute. In such circumstances, the fair value of the hire may be an element of damage, **and this is whether the substitute is actually procured or not.**

287 U.S. at 175 (emphasis added) (citing <u>Perkins</u>). The Court went on to state that where a shipowner did, in fact, maintain a spare boat which it kept in reserve to use as a substitute if another of its vessels was damaged, it was entitled to loss of use damages. <u>Id.</u> at 176-77.

Floyd's argument ignores the fact that Level 3 avoided even greater losses only because it had expended millions of dollars before the incident to have the dedicated, spare restoration capacity to which it rerouted a portion of the traffic from the Cable after Floyd damaged it. Both courts and learned commentators have stated that in such circumstances, the unfairness or "windfall" comes from denying the party damages for loss of use because it used its own property rather than procuring substitute property from another.

16

In The Cayuga, 5 F. Cas. 326 (E.D.N.Y. 1868), aff'd 5 F. Cas. 329 (C.C.E.D.N.Y. 1870), aff'd 81 U.S. 270 (1871), the owners of a ferry sought damages resulting from a collision with the Cayuga. They did not rent or hire a replacement during the time their ferry was out of service but rather, used another boat they already owned to perform the work of the damaged ferry. 5 F. Cas. at 327. The district court, nonetheless, awarded the plaintiff loss of use damages. 81 U.S. at 278; 5 F. Cas. at 331. In affirming, the circuit court gave this rationale for allowing loss of use damages even though the plaintiff used its own spare boat rather than hiring a substitute:

> The [plaintiffs] did not hire, and possibly might have been unable to hire, another ferry-boat to take their place on the ferry. These very reasons have compelled the [plaintiffs] to build and keep another boat, which they can use when accident or other cause disables one which they have in daily use.
>
> It is quite obvious, that there is neither justice nor equity in allowing to a tort-feasor the benefit of this large outlay made by the [plaintiffs] to enable them to serve the public and run their ferry without interruption; and yet that is the effect of yielding to the argument that, because such spare boat was already in the [plaintiffs'] possession, and was used, therefore the [plaintiffs] sustained no pecuniary loss by the delay... . The principle of indemnity is uniformly recognized as just, and its measure must be the same, whether a substitute is furnished by the [plaintiff] or procured from another... . To withhold compensation is, to my mind, obvious injustice.

5 F. Cas. at 331 (emphasis added). In affirming the award of loss of use damages, the Supreme Court adopted the circuit court's reasoning. 81 U.S. at 278.

In A. Brownstein, What's the Use? A Doctrinal and Policy Critique of the Measurement of Loss of Use Damages, 37 Rutgers L. Rev. 433 (1985), the author discussed an award of loss of use damages in a case where the plaintiffs operated lightships to guide navigation into a port and kept spare vessels available to ensure that service would not be interrupted:

> The case could have been decided by analogy to the collateral source rule. The plaintiffs essentially insured themselves against loss at considerable expense by purchasing and maintaining a spare boat. The defendant should not, therefore, reap the benefits of the plaintiffs' prudence by having the damage recovery reduced by the 'payout' of such self-insurance, the availability of a substitute vehicle to replace the damaged vessels.

Id. at 486 (emphasis added);[9] see also 5 D. Dobbs, Law of Remedies: Damages – Equity – Restitution, § 5.15(2), p. 880-81 (2d ed. 1993); McCormick, Handbook on the Law of Damages, § 124, p. 474 (1935) (denying recovery for the loss of use because the plaintiff did not actually rent substitute property "is untenable").

Contrary to Floyd's assertion, denying Level 3 loss of use damages would result in a windfall to Floyd by allowing Floyd to impermissibly "reap the benefits of [Level 3's] prudence" and work "an obvious injustice" to Level 3. See The Cayuga, 81 U.S. at 278, 5 F. Cas. at 331; Brownstein, 37 Rutgers L. Rev. at 486. It would also discourage Level 3 and similarly situated carriers from investing the millions of dollars necessary to have dedicated, spare restoration capacity available to protect the public in the event of a fiber cut. The Court should not penalize Level 3 for having a separate infrastructure in place to respond to emergency situations by allowing Floyd to reduce its own liability based on the increased level of preparedness in which Level 3 chose to invest for its business.

**V.    THE MAJORITY OF JURISDICTIONS WHICH HAVE ADDRESSED THE ISSUE HAVE ALLOWED A TELECOMMUNICATIONS CARRIER TO RECOVER LOSS OF USE DAMAGES EVEN THOUGH IT DID NOT OBTAIN SUBSTITUTE CAPACITY FROM ANOTHER CARRIER OR OFFER ANY EVIDENCE OF LOST PROFITS**

Level 3 was not able to find a decision from a Tennessee court addressing loss of use in the context of a telecommunications cable. However, the majority of courts which have done so have held that a telecommunications carrier was entitled to recover loss of use damages based on the replacement cost of substitute capacity even though it did not incur out-of-pocket costs to purchase that substitute capacity after the damage occurred or suffer lost revenues or profits. E.g., Western

_____

[9] The lightship case to which Professor Brownstein referred in his article, The Mediana, is the same case to which the Tennessee Supreme Court referred in Perkins. Compare Brownstein, 37 Rutgers L. Rev. at 486 with Perkins, 171 S.W. at 1159.

Innovations, 618 F. Supp. 2d at 1119-20; Toomer Elec. Co., 557 F. Supp. 2d at 747-48;[10] Patriot,

487 F. Supp. 2d at 1034, 1041;[11] MCI Network Services, Inc. v. LAI Constr. Services, Inc., Civil

No. CCB-05-322 (D. Md. Jan. 3, 2007);[12] Atlas, 2006 WL 3542332 at 9; Pelcrete, 2006 WL

1388490 at 1-2; [13] Kramer II, 2003 WL 22139791 at 1-2; MCI WORLDCOM Network Services,

Inc. v. OSP Consultants, Inc., 2002 WL 32166536 at 3 (N.D. Okla. Nov. 20, 2002) ("OSP

---

[10] In Toomer, Level 3 sought to measure its loss of use damages by the rental cost of a replacement cable or capacity, even though it did not actually expend funds to rent substitute capacity on another carrier's cable while its own cable was being repaired. 557 F. Supp. 2d at 746-47. The defendants argued that because Level 3 was able to reroute all traffic from the damaged cable onto another cable within its own network, Level 3 should not be able to recover loss of use damages based on the rental cost of substitute capacity. The Court first noted that there was no dispute that Level 3 would have been entitled to recover the actual cost of renting substitute capacity had it actually incurred those costs. The Court then stated that Level 3 was able to avoid the costs of renting substitute capacity from another carrier only because Level 3 had made the decision to incur the costs of building its own spare capacity for use in emergencies before the incident occurred and that the defendant could not reduce its own liability by relying on the increased level of preparedness in which Level 3 chose to invest for its business. Id. at 747. The Court went on to hold that Level 3 could recover loss of use damages for its severed cable notwithstanding that it chose to reroute traffic internally and that the appropriate measure of those damages was the reasonable costs that Level 3 would have expended to rent substitute capacity from another carrier. Id. at 747-48.

[11] In Patriot, MCI, sought to measure its loss of use damages by the cost to rent replacement fiber-optic capacity from another carrier during the time it took to repair the cable Patriot had damaged. 487 F. Supp. 2d at 1031, 1033. The Court noted that MCI, as Level 3 has done here, presented evidence that it built separate, spare dedicated restoration capacity on other cables in its network which it reserved for use in emergencies like Patriot's severance of the main working fiber-optic cable Id. at 1034 & n.2. The Court then held that MCI was entitled to recover damages for the loss of the use of the cable Patriot severed and that rental value, while not the only measure, could be a proper measure of rental value. Id. at 1041.

The Court did hold that MCI could not include the one-time installation charge unless it also prorated that charge as it had done with did with the monthly recurring charge. Id. Here, Level 3 has prorated **both** the monthly recurring charge and the one-time installation charge. L3F, ¶ 44.

[12] In LAI, MCI and Sprint sought damages for loss of use of a telecommunications cable based on the rental cost of replacement capacity, even though they did not actually rent replacement capacity from another carrier after the incident. LAI sought summary judgment that Level 3 and Sprint were not entitled to loss of use damages at all, and that even if they were, the rental cost of a substitute cable or capacity was not the proper measure of those damages. LAI claimed that allowing Level 3 and Sprint to recover loss of use damages when they had rerouted traffic to other cables in their own networks would permit Level 3 and Sprint to "reap a windfall." The LAI Court noted the dichotomy between the "spare boat" and the "ordinary use of business" theories or concepts. LAI Transcript (relevant portions attached as Ex. B) at 55-56. The Court then stated the evidence MCI and Sprint submitted raised a question of fact as to whether Level 3 and Sprint's spare capacity was more like the "spare boat" or "general use" cases which could not be resolved on summary judgment. Id. at 55-58. The Court held that the rental value of substitute property could be an appropriate measure of loss of use damages even if the actual substitute property was not rented and found that whether the cost of substitute property was a reasonable measure of Level 3 and Sprint's loss of use damages was a question of fact which could not be decided on summary judgment. Id. at 56-58; LAI Docket Sheet (Ex. C) at 1/3/07 Minute Entry.

[13] In Pelcrete, Level 3 and Sprint sought damages for loss of use of a cable that had been severed. The Court found that the rental cost of substitute capacity from another carrier was a reasonable basis for calculating MCI and Sprint's loss of use damages and awarded MCI and Sprint loss of use damages based on the rental cost of replacement capacity from another carrier, even though MCI and Sprint did not actually rent replacement capacity from another carrier or offer any evidence of lost profits. 2006 WL 1388490 at 1-2.

Oklahoma");[14] MCI WORLDCOM Network Services, Inc. v. Von Behren Elec., Inc., 2002 WL 32166535 at 2, 7 (N.D. Ga. May 21, 2002);[15] MCI WORLDCOM Network Services, Inc. v. Glendale Excavation Corp., 224 F. Supp. 2d 875, 880-81 (D.N.J. 2002) American Tel. & Tel. Co. v. Connecticut Light & Power Co., 470 F. Supp. 105, 107 (D. Conn. 1979); Ashland Pipeline Co. v. Indiana Bell Tel. Co., 505 N.E.2d 483, 490 (Indiana App. 1987); American Tel. & Tel. Corp. v. Thompson, 227 N.W.2d 7, 8-9 (Neb. 1975); Weleetka Light & Water Co. v. Northrop, 140 P. 1140, 1141 (Okla. 1914); Ohio Bell Tel. Co. v. Buckeye Directional Boring, Case No. 01CVH03-2230, slip op. at 5-7 (Ohio Common Pleas Mar. 14, 2002);[16] see 5 D. Dobbs, Law of Remedies: Damages – Equity – Restitution, § 5.15(1) at p. 875 n.13 (2d ed. 1993) ("[Loss of use claims] are appropriate in the case of . . . telephone cables . . .").

## VI.    THE CASES ON WHICH FLOYD RELIES ARE BOTH CONTRARY TO TENNESSEE LAW AND FACTUALLY DISTINGUISHABLE

Floyd claims that this Court has previously discussed Tennessee loss of use law and, based on that law, held in Corporate Air Fleet, Inc. v. Gates Learjet, Inc., 589 F. Supp. 1076 (M.D. Tenn. 1984), that a plaintiff can recover damages for loss of use of commercial property only for the time it actually rents a substitute.  Floyd further claims that Tennessee courts have purportedly reviewed

---

[14] In OSP Oklahoma, both parties sought summary judgment regarding Level 3's loss of use damages.  2002 WL 32166536 at 1.  MCI argued the reasonable cost of renting a replacement cable or capacity was a proper measure of its loss of use damages.  The defendant contended that Level 3 was not entitled to loss of use damages because MCI did not actually lease a substitute cable.  Id. at 3.  The Court held that loss of use damages could be measured by the fair rental value of a replacement cable during the period of repairs and that MCI 3 was entitled to loss of use damages even though it did not actually rent substitute property.  Id.

[15] In Von Behren, MCI sought damages for loss of use of a severed cable based on the cost of obtaining replacement capacity, even though it was able to reroute all traffic to other cables in its own network.  The defendant moved to compel MCI to provide information and produce documents concerning any profits or revenues it lost as a result of the fiber cut and also moved for summary judgment on MCI's loss of use claim, arguing that MCI did not suffer any loss of use because MCI had a "ring" system and been able to reroute all the calls to other cables in its own system.  The Court denied both motions, holding that the proper measure of damages for loss of use was the reasonable cost of the like or comparable property and that information regarding lost profits was therefore irrelevant.  2002 WL 32166535 at 2, 7.

[16] In Ohio Bell, the plaintiff sought damages for its loss of the use of an underground cable the defendant had severed.  The defendant argued that the plaintiff was not entitled to loss of use damages because the plaintiff admitted it did not sustain any interruption in service or loss of revenue.  Case No. 01CVH03-2230, slip op. (Ex. D) at 4.  The Court found that Ohio law was consistent with § 929 of the Restatement (Second) of Torts and held that the plaintiff was entitled to loss of use damages even though if did not sustain any interruption in service or loss of revenue.  Id. at 6.

Corporate Air "with approval." Floyd Memorandum (D.E. 29) at 11-13. Floyd is wrong on both accounts.

First, the very language Floyd quotes in its memorandum shows that the Corporate Air Court did not rely on any Tennessee law for its holding limiting the plaintiff's damages for the loss of use of a private corporate jet to the time in which the plaintiff actually rented a substitute plane. Rather, the Court relied on a decision from the Michigan Court of Appeals and the Louisiana Court of Appeals. Corporate Air, 589 F. Supp. at 1082. Indeed, the Court did not even attempt to reconcile its decision with Perkins in which the Tennessee Supreme Court rejected the argument that a plaintiff must actually rent substitute property before being entitled loss of use damages as "not tenable." See Perkins, 177 S.W. at 1159.

Second, subsequent decisions from Tennessee state courts have, in fact, disagreed with Corporate Air. In Tinker, the trial court awarded the plaintiff damages for loss of use of an automobile even though the plaintiff did not rent a substitute automobile or compensate friends or family who gave her rides while her automobile was being repaired. The defendant, citing Corporate Air, argued that the plaintiff could only recover for actual expenses incurred during the time her car was being repaired. The Court rejected the defendant's argument and held that Corporate Air was limited to its unique facts concerning the use of a special purpose airplane and that proof of actual rental in the case of an automobile was not necessary. 1986 WL 4757 at 3.

The telecommunications traffic carried on the Cable Floyd damaged includes voice phone calls, internet service, cellular telephone service and cable and satellite television. L3F ¶ 41. These are unquestionably part of the fabric of daily life which are much more heavily used and relied upon by the public than the private corporate jet at issue in Corporate Air. As the Tennessee Court of Appeals did in Tinker, this Court should refuse to apply the logic of Corporate Air to property which is far more like the automobile at issue in Tinker than the private corporate jet at issue in

21

Corporate Air.

Floyd also quotes extensively from the Colorado Court of Appeals' January 2010 decision in

PurCo Fleet Services v. Koenig, 240 P.3d 435 (Colo.App.), cert. granted, 2010 WL 3389333 (Colo.

Aug. 30, 2010), in which the Court held that that in the context of commercial property, a plaintiff

must show lost income to recover damages for the loss of use. Floyd's reliance on PurCo is

misplaced.

First, PurCo is contrary to the pronouncements of Tennessee courts discussed above which

do not require a plaintiff to show lost profits in order to recover loss of use damages. Second, it is

not clear that PurCo even accurately reflects Colorado law on this subject.

Prior to PurCo, Colorado courts repeatedly allowed loss of use damages for injury to

personal property, measured by the reasonable rental value of the property, for the time reasonably

necessary to repair the property. E.g., Buchanan v. Leonard, 127 F. Supp 120, 122-23 (D. Colo.

1954); Denver Bldg. & Constr. Trades Council v. Shore, 287 P.2d 267, 273 (Colo. 1955); Airborne,

Inc. v. Denver Air Center, Inc., 832 P.2d 1086, 1089 (Colo. App. 1992); Duggan v. Weld County

Comm'rs, 747 P.2d 6, 9 (Colo. App. 1987); Francis v. Steve Johnson Pontiac-GMC-Jeep, Inc., 724

P.2d 84, 86 (Colo. App. 1986); Hillman v. Bray Lines, Inc., 591 P.2d 1332, 1336 (Colo. App.

1978); see Colo. Jury Instr.-Civ. 6:13 (4th ed. 2009).[17]  This was true regardless of whether the

plaintiff actually rented substitute property and applied to commercial as well as personal property.

Buchanan, 127 F. Supp at 122-23 (semi tractor cab); Denver Bldg., 287 P.2d at 272-73 (heavy

construction equipment); Airborne, 832 P.2d  at 1089 (airplane used for business purposes);

_____

[17] Colorado Civil Jury Instruction 6:13, entitled "Personal Property-Loss of Use," provides: "If you find in favor of the plaintiff, you shall also award an amount which will reasonably compensate the plaintiff for any loss of us of (his) (her) *(insert descrior of property)* during the time reasonably required to make the necessary repairs.  These damages must be proven by a preponderance of the evidence.  The measurer of these damages is the *(the reasonable rental value of the [insert description] (the reasonable cost of renting similar [insert description] for use)* while repairs are being made." This is very similar to Tennessee's Pattern Civil Jury Instruction regarding loss of use.  See T.P.I.-Civil 14.43 Loss of Use.

<u>Francis</u>, 724 P.2d at 85-86 (personal vehicle); <u>Hillman</u>, 591 P.2d at 1336 (semi truck and trailer).

Colorado courts' subsequent treatment of <u>PurCo</u> likewise calls it into question. In May 2010, **the same division of the Court of Appeals** addressed a situation in which a defendant was ordered to pay restitution for the theft of an asphalt roller from a rival asphalt company. <u>People v. Suttmiller</u>, 240 P.3d 504 (Colo. App. 2010). The Court stated that, "The application of a rental value measurement to compensate for the loss of use of an item is appropriate **even when, as here, the owner suffered no out-of-pocket expenses, 'as when he was not using the subject matter at the time or had a substitute that he used without additional expense to him**.'" <u>Id.</u> at 508 (emphasis added).

In August 2010, the Colorado Supreme Court granted certiorari in <u>PurCo</u>. <u>PurCo</u>, 2010 WL 3389333 at *1. One of the issues the Supreme Court has stated it will review is, "Whether the court of appeals erred in concluding that the measure of damages for loss of use is net lost profits." <u>Id.</u> Thus, it is not certain whether <u>PurCo</u> will survive appellate review. In sum, the cases on which Floyd seeks to rely are contrary to Tennessee law, factually distinguishable, and should be rejected.

## <u>CONCLUSION</u>

With respect to liability, Floyd has admitted that he struck and damaged Level 3's conduit bank and the Cable on August 15, 2010. Level 3 has submitted evidence which raises genuine issues of material fact as to whether that initial damage, or the additional damage Floyd inflicted on August 16, 2010, caused the fibers in the Cable to deteriorate to the point where they could no longer carry traffic.

With respect to loss of use damages, Floyd's arguments are contrary to Tennessee law which allows damages for the loss of use regardless of whether the plaintiff incurred out-of-pocket costs to rent substitute property or incurred lost profits. Denying Level 3 loss of use damages because it

23

was able to protect the public by rerouting traffic from the damaged Cable to dedicated, spare restoration capacity which Level 3 built at a cost of millions of dollars and reserves exclusively for use in emergencies would result in a windfall to Floyd and would discourage telecommunications companies from taking the actions necessary to protect the public in the future. Level 3 therefore respectfully requests that the Court deny Floyd's motion for summary judgment.

Respectfully submitted,

s/ Brandon B. Rule

| | |
|---|---|
| John R. McCann | James J. Proszek, *pro hac vice* |
| BURCH, PORTER & JOHNSON, PLLC | Brandon B. Rule, *pro hac vice* |
| 130 North Court Avenue | HALL, ESTILL, HARDWICK, GABLE, |
| Memphis, TN 38103 | GOLDEN & NELSON, P.C. |
| Telephone (901) 524-5101 | 320 South Boston Avenue, Suite 200 |
| Facsimile (901) 524-5024 | Tulsa, OK 74103-3706 |
| | Telephone (918) 594-0400 |
| and | Facsimile (981) 594-0505 |

**ATTORNEYS FOR PLAINTIFF**
**LEVEL 3 COMMUNICATIONS, LLC**

## CERTIFICATE OF SERVICE

On the 20th day of January 2011, I electronically filed this document through the CM/ECF system, which will send a notice of electronic filing to:

David A. Bates
Creighton N. Fossett
DUBOIS, DUBOIS & BATES, P.C.
810 South Garden Street
Columbia, TN 38402

*dbates@duboislegal.com*
*nfossett@duboislegal.com*

s/ Brandon B. Rule

1196435.1:912444:01357