UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

LEVEL 3 COMMUNICATIONS, LLC,       )
                                    )
        Plaintiff,                  )    Case No. 1:09-0082
                                    )    Judge Trauger
v.                                  )
                                    )
MICHAEL R. FLOYD d/b/a FLOYD &      )
FLOYD CONTRACTORS,                  )
                                    )
        Defendant.                  )

## MEMORANDUM

Pending before the court is the defendant's Motion for Summary Judgment (Docket No. 27), to which the plaintiff has responded (Docket No. 35), and the defendant has filed a reply in support (Docket No. 38). The plaintiff has also filed a Motion *in Limine* to exclude evidence and testimony from the defendant's causation expert, Richard Haglund (Docket No. 33), to which the defendant has responded (Docket No. 37). For the reasons discussed herein, both of these motions will be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

In August 2007, employees of the defendant, Michael R. Floyd d/b/a Floyd & Floyd Contractors ("Floyd"), were installing storm drains and water lines at a new subdivision known as "Arden Village" along Highway 31 in Columbia, Tennessee (the "job site").[1] The plaintiff,

---

[1] Unless otherwise noted, the facts are drawn from the parties' statements of material facts (Docket No. 39) and related affidavits and exhibits. Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). The defendant frequently objected to the plaintiff's statements of material fact, and the defendant

Level 3 Communications, is a telecommunications services provider that owns a right-of-way along Highway 31 where its fiber-optic cable (the "Cable"), used for providing voice and data services to clients, was buried. Also buried was the conduit (or piping) in which the Cable was contained and protected, along with eleven unused conduits. The Cable, in turn, contained 8 bundles of "buffer tubes," which each contain 12 glass fibers. Data is transmitted along the glass fibers. At the time of the accident discussed below, 36 of the 96 fibers were actively transmitting data.

On August 14, 2007, the plaintiff's employees, Allen Hannah and his supervisor Jeff North, went to the job site to discuss how the defendant's excavation work might impact the Cable. There, they met with, among others, Anthony Howell, a Floyd supervisor. The parties agreed that the installation of the storm drain could pose a risk to the Cable, given that the storm drain was to be installed at the same depth as the Cable. The plaintiff maintains that, before North and Hannah left the site on the 14th, all parties agreed that the defendant would not

---

attached an appendix further outlining its objections and continuing its summary judgment arguments. (Docket No. 39 at 69-79.) Particularly on causation issues, technological issues, and general issues surrounding the telecommunications industry's efforts to combat improper excavation, the defendant often made boilerplate objections (lack of personal knowledge, inadmissible opinion testimony by a lay witness, inadmissible expert opinion, relevance and hearsay) to the affidavit or deposition testimony on which the plaintiff based the statement. (See Docket No. 39 at 18, 35, 38, 42-52, 54-68.) As can be seen herein, while some of the defendant's objections have merit (particularly on the issue of improper lay witness testimony), the genuinely disputed issues of fact on causation (which preclude summary judgment) are clear from the basic facts, notwithstanding the defendant's objections. Also, wherever the plaintiff responded to a statement by admitting and clarifying the statement, the defendant replied by stating: "The Plaintiff fails to state that the specifically asserted fact is disputed as required by Local Rule 56.01(c) and otherwise fails to demonstrate that the asserted fact is disputed. Therefore, pursuant to Local Rule 56.01(g), the Plaintiff's failure to respond 'shall indicate that the asserted facts are not disputed for purposes of summary judgment.'" (*See e.g. id.* at 2.) Local Rule 56.01(g) concerns instances where one side has not responded at all – not where the party has responded in a verbose manner. The court is able to cull through the relevant materials and synthesize the relevant facts and the degree to which they are genuinely disputed.

conduct excavating work that could jeopardize the Cable without notifying Level 3. Notification would allow a Level 3 representative to return to the site to monitor the excavation and ensure the security of the Cable.

On the morning of August 15, 2007, without informing Level 3, Howell and other Floyd employees resumed digging in the same area and "snagged" several of the conduits with a trackhoe, including the one carrying the Cable. (Docket No. 39 at 8.) Hannah, who happened to be driving by the job site on the way to another appointment, saw the ongoing digging and, dismayed, stopped. When Hannah came on to the job site, he was informed by Howell that several of the conduits had been damaged, or, as Hannah described it, "badly kinked."[2] (*Id.*.)

After discovering the damage, Hannah contacted Dennis Wuest, at the plaintiff's "gateway" facility in Nashville, Tennessee, to determine if the plaintiff's systems were reporting a network outage. Wuest informed Hannah that the plaintiff's systems, which report service outages and line damage through alarms and warning lights on a grid, were not reporting any outages. Hannah then used a pocket knife to slit the top of the conduit that contained the Cable to visually inspect the Cable and the fibers therein. According to Hannah, the Cable did not appear to have been damaged, and, therefore, he left the job site. As he left, he again informed Howell that no digging was to be conducted in the area around the Cable until the plaintiff could send out repair crews. No relevant service outages were reported for the remainder of the day on August 15, 2007.

The defendant maintains that, at this point, its employees "proceeded to work at another location, approximately 800 feet away from the plaintiff's cable" and performed no work in the

---

[2]As discussed herein, whether Floyd employed reasonable care in its operations is not a central issue in the summary judgment briefing. (Docket No. 39 at 27-30.)

3

"subject area until after the plaintiff completed all [] repairs." (*Id.* at 14.) The plaintiff maintains that the defendant returned to the same site and continued working. At his deposition, Hannah testified that, when he left the site on the morning of the 15th, the Cable was supported by rock and earth but, when he returned in the late afternoon on the 16th, the Cable was unsupported and was "hanging in mid-air," suggesting, but not conclusively showing, that further excavation around the Cable had been done. (Docket No. 36 Ex. 3 at 104-106.)

At 12:24 p.m. Central Daylight Time on August 16, 2007, the "alarms" at the plaintiff's gateway facility began going off, indicating that telecommunications traffic along the plaintiff's network was being adversely impacted. Level 3 maintains that, at this point, Wuest informed Hannah of the alarms, and Hannah went to Level 3's Rockdale, Tennessee site to "verify the alarms and run a trace on the line to pinpoint the source of the outage." (Docket No. 39 at 19.) Level 3 maintains that it "traced the source of the alarms to the location where Floyd damaged the Cable" the day before and that, at this point, "neither Level 3 nor its contractors had returned to Floyd's Job Site nor had they initiated any repair work."[3] (*Id..* at 11, 19.)

Level 3 began to restore customer traffic by "rolling traffic from damaged buffer tubes in the Cable to spare, unused fibers on the same Cable which Level 3 reserves for use in an

---

[3]Floyd maintains that there is evidence that Level 3's repairs to the Cable caused the outage. (Docket No. 29 at 4.) Indeed, North filed a report and testified at his deposition that it was his impression that the outage had occurred when repair work was being conducted. (Docket No. 28 Ex. 2 at 56.) North, however, was not in Tennessee during the outage and was relying on second-hand information in completing his reports. (*Id.* at 56-58.) As North conceded, at least two other reports indicate that "Level 3 crews and their contractors responded to the site after alarms went off" and that "the people on site, their observations and their memories would be much clearer and much more accurate than mine." (Docket No. 36 Ex. 10 at 91-93.) Both Wuest and Hannah testified at their depositions that Level 3 "had nobody on the site" at the time of the outage and that it was Hannah's job to organize and lead the repairs. (*See* Docket No. 36 Ex. 11 at 85; Docket No. 36 Ex. 3 at 94, 108.) Based upon the court's review of the record, it appears that North was simply mistaken about the timeline of the relevant events.

4

emergency." (Docket No. 39 at 19-20.) However, Level 3 realized that service to certain customers (known as "dark fiber" customers) could not be restored without a physical repair at the site. Level 3 maintains that its repair crew arrived at the job site at approximately 4 p.m. CDT on August 16th and initiated repairs to the Cable. It was at this point that Hannah observed that the Cable had been moved to its "hanging" position.

In order to fully restore traffic, Level 3 and its contractors removed and replaced approximately 70 feet of Cable, which the plaintiff alleges cost $45,483.07. The plaintiff filed this lawsuit on November 23, 2009, asserting claims for trespass and negligence. (Docket No. 1.) As discussed below, the plaintiff also seeks $300,423.76 in "loss-of-use" damages, represented by the reasonable rental cost of "comparable capacity on another carrier's cable sufficient to replace the capacity of only those transport systems that were active and impacted" for the 2.9 hours that the plaintiff lost use of the Cable – that is, the 2.9 hours that it took for the plaintiff to "roll its traffic" from damaged fibers on the Cable to non-damaged ones on the same Cable. (Docket No. 39 at 22-24.)

## **ANALYSIS**

### I.     **Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) requires the court to grant a motion for summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings "set[ting] forth specific facts showing that

there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the [plaintiff]." *Moldowan*, 578 F.3d at 374.

"'[T]he judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient," and the plaintiff's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the plaintiff. *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## II.  Defendant's Motion for Summary Judgment

The defendant's Motion for Summary Judgment has two components. One, the defendant seeks dismissal of this case on the grounds that there is insufficient evidence to show that the August 16, 2007 outage was caused by the defendant's conduct. (Docket No. 29 at 1.) Two, alternatively, the defendant seeks partial summary judgment, arguing that the "court must dismiss the plaintiff's claim for loss of use damages." (*Id.*)

### A.  Causation – Part One

There is no dispute that damage causation is a key element of both causes of action the plaintiff asserts here. *Ward v. City of Lebanon*, 273 S.W.3d 628, 634 (Tenn. Ct. App. 2008)(negligence); *Caldwell v. Canada Trace*, 2004 WL 1459418, *7 (Tenn. Ct. App. June 28, 2004)(trespass)(internal quotation omitted)).

6

The defendant argues that its digging did not cause the service outage because no service outage was reported for more than 24 hours after the Cable was "snagged." (Docket No. 29 at 8.) The defendant retained an expert, Dr. Richard Haglund, who is a professor of physics at Vanderbilt University. (Docket No. 37 Ex. 1.) Dr. Haglund submitted a report in which he opines that, based upon his inspection of the outside of the Cable and its "multi-layer exterior armoring," the impact from the trackhoe was of "modest" effect, and there is "no reason to believe that the deflection by itself caused any damage to the cable that would have interfered with sending signals on the cable." (*Id.* at 4-5.) Dr. Haglund also concludes that, given the sensitive nature of the fibers, if there had been significant damage caused by the trackhoe, it would have been detected by the plaintiff's systems immediately, and, therefore, "whatever damage was reported on August 16, 2007 resulted from some other cause" besides the August 15, 2007 trackhoe strike. (*Id.* at 6.)

In response, the plaintiff reiterates its position, based upon Hannah's observation that the Cable had been moved, that Floyd continued its excavation work around the Cable after the August 15, 2007 "snagging" of the Cable, likely causing further damage to the Cable. (Docket No. 35 at 8.) Moreover, the plaintiff theorizes, the initial strike on August 15, 2007 could have fractured or shattered glass within the Cable, leading to "subsequent degradation and loss of signal" the next day, much like a chip on a windshield slowly develops into a full-blown crack. (*Id.* at 7-9.)

In support of this view, the plaintiff largely relies on Hannah's deposition testimony, in which he suggested that, based upon his professional experience, once the cable is "kinked," the glass within the cable is liable to react in a variety of different ways, depending on the degree of

7

the glass fracture and environmental stressors. (Docket No. 39 Ex. 2 at 84.) While Hannah conceded that he did not know the exact pressures at which the glass would react in a certain way, he maintained that it was entirely plausible that fractures in the glass could worsen over time, resulting in service disruptions. (*Id.* at 103.)

Each party challenges the other party's witness. In its briefing and its Motion *in Limine*, the plaintiff argues that Haglund is not a reliable witness under *Daubert*, and, in its briefing and in its "appendix," the defendant argues that Hannah is improperly offering expert testimony. An aside is necessary to discuss each witness.

### i. Haglund

Federal Rule of Evidence 702 provides that, "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. In *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993), the Supreme Court identified four non-exclusive factors that may be helpful to the court in assessing the relevance and reliability of expert testimony, that is, (1) whether a theory or technique can and has been tested; (2) whether the theory or technique has been subject to peer review and publication; (3) the known or potential error rate and the existence and maintenance of standards controlling the theory or technique's operation; and (4) the extent to which a known technique or theory has gained general acceptance within a relevant scientific community. *Id.* at 593-94.

8

In its "gate-keeping" role, a trial court must evaluate the relevance and reliability of all expert testimony, whether the testimony offered is "scientific" or not. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). That said, the *Daubert* factors do not constitute a "definitive checklist or test." *Id.* at 150. Indeed, the court's fundamental objective is to generally evaluate, based on whatever factors are important in the particular case, the relevancy and reliability of the testimony, and not necessarily to explore factors that might not be relevant to a particular case, such as whether the expert's methods are subject to empirical testing. *Id.* at 151. That is, the court is to ensure that the proffered testimony is reliable and relevant and that the expert, whatever his field, "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

When expert testimony is primarily based on the experience that the proffered expert has gained through personal endeavors, the expert "must explain how that experience leads to the conclusion reached . . . and how that experience is reliably applied to the facts." *Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005) (internal quotation omitted). In light of all of this, the court's paramount consideration remains, as explicitly stated in Federal Rule of Evidence 702, whether the proffered testimony will assist the trier of fact. Fed. R. Evid. 702.

The plaintiff argues that, while Haglund is unquestionably a widely respected physicist (he holds a Ph. D. in experimental nuclear physics and has served on the faculty at Vanderbilt for almost 30 years), his deposition revealed that he has very little relevant experience with fiber-optic cables. (Docket No. 34 at 5.) While he has published many articles, the plaintiff maintains that none of them has "anything to do with the tensile strength of fiber-optic cable, damage to, or repair of fiber-optic cable," nor has Haglund done any research, or prior to this case, read any

9

articles on the "durability of fiber-optic cables in the field." (*Id.* at 6-7.)  Moreover, Haglund only inspected the "outer sheath of the Cable," failing to "inspect the glass fibers at the point of impact" for any damage or to test the Cable in any way. (*Id.*)  Nor did Haglund know the size of the trackhoe "bucket" that hit the Cable or the force with which the bucket hit the Cable. (*Id.*) Also, Haglund spoke only of the "general" properties of fiber-optic cable, he could not speak to the properties of this specific Cable, and, of course, he was unable to say whether Floyd continued working on the site around the Cable after the August 15, 2007 incident.[4] (*Id.*)

In response, the defendant argues that, while Haglund may not be directly involved in the manufacture or repair of fiber-optic cables, he is, by the nature of his life's work, "very familiar with the theory and practice of how communication occurs by optical fibers," how such fibers are constructed and protected, and how communication amongst optical fibers is monitored. (Docket No. 37 at 4.)  Therefore, the defendant argues, the plaintiff's suggestion that Haglund lacks experience with the relevant products is simply incorrect. (*Id.*)

The defendant goes on to claim that, from his personal inspection of the Cable (and viewing photographs from the site), Haglund concluded that the degree of "deflection" (or bending/denting) of the conduit reflected a strike that the fibers within could survive. (*Id.* at 9.) That is, the inspection revealed that the glass fibers were well protected and the "integrity of the armored cable sheath was never compromised," making it highly unlikely that any of the "fiber cables enclosed in the sheath" were broken by the trackhoe strike. (*Id.* at 10.)

Understanding the limitations of Haglund's proposed testimony, the court is of the view

---

[4]The plaintiff also objects that Haglund's testimony contains "legal conclusions" on causation. (Docket No. 34 at 8-9.)  Rule 704 permits testimony that embraces the "ultimate issue," which is what Hagland's testimony on causation would do.  Fed. R. Evid. 704.

10

that he is qualified under Rule 702 and *Daubert* to offer his limited expert opinion in this case. Again, Haglund's qualifications as a world-renowned physicist are unquestioned. And contrary to the plaintiff's argument, in his deposition, Haglund testified that the technology, manufacture, and design of fiber-optic cables in both "theory and practice" is "very familiar" to him from decades of lab work using fiber-optic cables "for communicating, for signaling and for data transport." (Docket No. 37 Ex. 2 at 14-15, 18.) On a general level, Haglund is certainly well qualified to offer an opinion regarding the physical properties of fiber-optic cable, which is certainly a relevant issue in this case.

On reliability, it is, again, important to recognize the limitations of Haglund's proposed testimony. Haglund only intends to opine on whether the August 15 trackhoe strike could have caused the August 16 outage. In forming the opinion that it did not, Haglund relies on his physical examination of the Cable, the pictures from the scene, his understanding of the physical properties of the materials involved, and the manner in which service outages are reported. From his physical observations of the Cable, Haglund concluded that a strike that would have caused the outage would have caused more apparent damage to the Cable and would have been signaled immediately. This seems to the court an entirely reasonable and reliable method for analyzing causation in this circumstance.

Again, there are issues with Haglund's testimony; he conceded that he has done no research on the "durability" of commercial cables "in the field," has little experience inspecting damaged cables, and had not researched how much damage a commercial fiber-optic cable can sustain "before it will drop a signal." (*Id.* at 36, 50-51.) And, Haglund conceded, his entire opinion could be changed if there were, in fact, subsequent disturbances to the Cable after the

11

initial strike on August 15th. (*Id.* at 85-86.) Additionally, it remains somewhat unclear (at least to the court) how the Cable appeared to Haglund to be intact during his October 2010 examination of the Cable, yet was apparently the source of the August 16, 2010 outage. But, in light of Haglund's qualifications, professional experience, and his methods, these concerns must go to the weight and, importantly, the limitations of Haglund's testimony, not its admissibility under *Daubert.*

### ii.     Hannah

The defendant objects to Hannah, who is not offered as an expert, asserting the plaintiff's "delay of damage" theory. (Docket No. 38 at 5.) That is, Hannah testified at his deposition that significant pressure on the Cable from the trackhoe could have fractured the glass (but not sufficiently to cause an outage), and a myriad of factors, including temperature and subsequent stress, could have resulted in the initial fracture slowly becoming one that caused the service outage. (Docket No. 36 Ex. 3 at 84, 102-106.) The defendant argues that such opinions, even assuming they are supportable, are expert opinions, and Hannah, as he is not an expert, is not qualified to offer them. (Docket No. 38 at 8.)

The defendant is correct. Federal Rule of Evidence 701 specifically prohibits lay opinion testimony that is "based on scientific, technical or other specialized knowledge within the scope of Rule 702." Here, Hannah's personal experience and qualifications notwithstanding[5], he is attempting to testify about how glass fibers within a fiber-optic cable respond to certain impacts, temperature and other stressors. This is expert testimony, as it involves knowledge "well beyond

---

[5]The defendant points to several places in Hannah's deposition where he disclaimed knowledge of the specific processes by which the glass would have slowly fractured in this instance. (Docket No. 38 at 9.)

12

that of the average layperson." *See U.S. v. Ganier*, 468 F.3d 920, 922 (6th Cir. 2006); *U.S. Aviation Underwriters, Inc. v. Yellow Fright Sys., Inc.*, 296 F. Supp.2d 1322, 1331-32 (S.D. Ala. 2003) (rejecting, under Rule 701, effort by plaintiff's employee to offer non-expert opinion on the "type of force required to cause the observed damage" to an aircraft engine)). The plaintiff does not dispute that it did not disclose or offer Hannah as an expert, and, therefore, his efforts to explain the scientific basis for the "delay in damage" would not be admissible at a trial of this case and cannot be used as evidence to defeat the defendant's summary judgment motion.

B.         Causation – Part Two

While the limitations on Hannah's testimony leave a hole in the plaintiff's case, they do not signal victory for the defendant, because, viewing the facts in the light most favorable to the plaintiff, a reasonable jury could still find that the defendant caused the relevant damage to the Cable. That is, there is no dispute that, on August 15, defying a previous order to cease working without Level 3 supervision, the defendant excavated around the Cable and struck it. The next day, an outage was reported due to problems with the Cable at the exact spot where the defendant had struck it the day before. This creates a strong, albeit circumstantial, case that the defendant was somehow responsible for the outage.

Even if the jury is convinced by Haglund's testimony that the August 15th strike could not have caused the outage, Haglund conceded that he has no idea what happened after the initial strike. Hannah testified that, when he returned to the site after the outage on the 16th, the Cable was positioned differently than it was when he left on the 15th – that is, before the Cable was supported by rock and dirt and, later, it was "hanging" in the air. (Docket No. 36 Ex. 3 at 103-105.) While this is not a smoking gun showing that Floyd resumed damaging work around the

13

Cable, it helps support the notion that there is sufficient evidence for a jury to find that, whatever precisely happened to cause the outage, Floyd was responsible. This conclusion is based upon the fact that (1) there was an outage emanating from the same spot as the initial strike; (2) Hannah observed that the Cable had been moved; (3) Floyd had demonstrated an inability to follow instructions to cease working; and (4) there is very little credible evidence suggesting any other possible cause.[6] Therefore, the defendant is not entitled to summary judgment on the causation issue.

### C. Loss of Use

The next issue is whether the plaintiff is entitled to seek its estimated reasonable rental value (about $300,000) of the "good fibers" on the Cable that the plaintiff used during the 2.9-hour period that it was "rolling" traffic from the bad fibers on the Cable to the good fibers on the Cable. (Docket No. 29 at 10.) There is no dispute that, if the plaintiff had actually rented substitute capacity to replace the bad fibers, it would be entitled to the rental value of that capacity, if the defendant was proven at fault. *Tire Shredders, Inc. v. Erm-N. Cent, Inc.*, 15 S.W.3d 849, 855 (Tenn. Ct. App. 1999). However, the defendant argues, the plaintiff did not actually incur any "rental" expenses; it merely used space on its own line to transmit data. (Docket No. 29 at 10.)

The defendant relies heavily on *Corporate Air Fleet, Inc. v. Gates Learjet, Inc.*, 589 F.

---

[6]The defendant suggests that the Cable was moved by the plaintiff's representatives when they came out to repair the damage to the Cable. (Docket No. 38 at 13.) The defendant points to a picture submitted by the plaintiff, which shows the Cable suspended in mid-air on August 16, 2007. (Docket No. 36 Ex. 9.) The caption notes the conduit's "angle of deflection . . . after temporary repair." (*Id.*) Temporary repair could simply refer to the patching of the Cable that Hannah did after he sliced the conduit open on the 15th to inspect the damage. (Docket No. 36 Ex. 3 at 93.) If anything, the defendant's argument further underscores that what happened to the Cable after the initial strike is genuinely disputed.

Supp. 1076, 1078 (M.D. Tenn. 1984)(Nixon, J.). At issue in that case was whether the plaintiff could recover the reasonable rental value of a personal airplane for the time period that the plaintiff's airplane was undergoing repairs. *Id.* Judge Nixon determined that, where one has been negligently deprived use of a chattel, the "purpose of awarding damages is to compensate for damages actually incurred, not to provide a plaintiff with a windfall," and, therefore, the plaintiff could only recover for the time period that he "actually rented" a substitute plane. *Id.* at 1081-82; *see also Tire Shredders*, 15 S.W.3d at 854 (quoting the "actually rented" language).

The defendant recognizes that Tennessee authority, in the personal vehicle context, allows for "loss of use" recovery, even if no replacement vehicle was rented. *Perkins v. Brown*, 132 Tenn. 294 (Tenn. 1915); *Scott v. Houston*, 2010 WL 680984, *7 (Tenn. Ct. App. Feb. 26, 2010)(finding a plaintiff could recover a daily "loss of use" amount, even if no vehicle was rented, but only for days that she customarily drove the vehicle)). The defendant also refers to an "extremely detailed discussion of loss of use damages" in a Colorado state court case, in which the court determined that a car rental company was not automatically entitled to loss of use/rental damages for the period that its car was being repaired. (Docket No. 29 at 16 citing and quoting at length *PurCo Fleet Servs., Inc. v. Koenig*, 240 P.3d 435 (Col. App. 2010)). In conclusion, the defendant argues that it would be fundamentally unfair to award the plaintiff $300,000 "for a time period of 2.9 hours, even though the Plaintiff received the same amount of revenue and profit from its customers during this time period as if an accident had never occurred." (Docket No. 38 at 18.)

In response, the plaintiff points to *Perkins* and another car repair case that held that actual rental was not necessary to recover "loss of use" damages. *Tinker v. Wix Corp*, 1986 WL

15

4757, *3 (Tenn. Ct. App. April 22, 1986).  In light of these cases, the plaintiff argues, Tennessee law "does not require Level 3 to obtain substitute capacity from another carrier before being entitled to damages from its loss of the use of the Cable."  (Docket No. 35 at 12.)

Moreover, the plaintiff maintains, at considerable expense, it reserved the substitute capacity on the Cable "exclusively for use in emergencies."[7]  (*Id.*)  Therefore, the substitute capacity is akin to a "spare boat," and the plaintiff should not be punished for being proactive and avoiding the need to obtain substitute capacity after the outage, which would have been highly problematic for Level 3's customers.  (*Id.* at 13 citing *Brooklyn E. Dist. Terminal v. U.S.*, 287 U.S. 170, 176-77 (1932)(finding that a shipowner who used a spare boat that he had obtained for emergences prior to the accident that damaged the primary boat was entitled to loss-of-use damages).

The plaintiff points to numerous, non-controlling, cases in which the district court concluded that a similarly situated telecommunications company was not precluded from offering loss-of-use evidence to the jury, even though the company had not actually rented substitute capacity following an accident but had relied on spare capacity that was used for emergencies to avoid more significant losses.  (*Id.* at 14, 18-20 citing *e.g. MCI v. Kramer Tree Specialists*, 2003 WL 22139794, * 2 (N.D. Ill. June 19, 2003); *MCI v. Atlas Excavating*, 2006

---

[7]The defendant makes its blanket objections (personal knowledge, etc.) to the proposition that this space on the Cable was reserved exclusively for emergencies.  (Docket No. 39 at 52-53.)  In the appendix, the defendant goes on to argue that Lisa Fox, the Level 3 employee who made the "only for emergencies" assertion in her affidavit, did not have personal knowledge of the issue because she has limited education and did not work on the issues surrounding this case until 2009.  (Docket No. 36 Ex. 8 at 6; Docket No. 39 at 75-79.)  Ms. Fox is the cost recovery program manager for Level 3, and there is every indication that, in that capacity, she would have personal knowledge of how Level 3 generally organizes the capacity on its cables.  (Docket No. 36 Ex. 8 at 1.)

WL 3542332, *7 (N.D. Ill. Dec. 6, 2006); *Sprint Communications Co. v. W. Innovations*, 618 F. Supp.2d 1101, 1119 (D.Ariz. 2009); *MCI v. OSP Consultants, Inc.*, 2002 WL 32166536, *3 (N.D. Okla. Nov. 20, 2002)). The plaintiff maintains that *Corporate Air* must be distinguished on its facts, that is, *Corporate Air* involved a potential windfall recovery for a private jet owner, whereas, here, Level 3 is seeking compensation for the proactive work it did to maintain critical communications infrastructure, despite the defendant's negligence. (*Id.* at 21.)

The propriety of awarding the significant loss-of-use damages that Level 3 seeks here is an issue about which reasonable minds could differ. As Judge Nixon noted in *Corporate Air*, tort damages in this context are designed to compensate for losses actually suffered and here, facially, the plaintiff suffered no direct losses (other than the repair costs). However, as the Supreme Court recognized almost 80 years ago and as numerous district courts have recognized in the telecommunications context, it is important to take an expansive view of the concepts of "renting" or replacing capacity during a period of loss or injury. These courts recognize that a proactive business owner who takes care to ensure that the loss of the primary chattel will not result in a service disruption to customers should be entitled to the loss-of-use damages to which less proactive business owners are, unquestionably, entitled.

Here, Level 3 maintains, it paid for and reserved space on the Cable that allowed it to transmit data despite the injury to another part of the Cable. If it had not done so and had to go and rent substitute capacity, it would be entitled to that rental cost if it proved the defendant's negligence. *Tire Shredders*, 15 S.W.3d at 854. Additionally, the defendant's alleged conduct left the plaintiff in a more vulnerable position, unable to respond to any other emergencies that could have developed on the line during the period of repair. Under *Brooklyn Eastern* and the

17

subsequent telecommunications cases, the court concludes that this theory of damages recovery is not invalid as a matter of law, and, therefore, the jury should be free to consider "loss of use" in making its damage determination in this case.[8]

## CONCLUSION

For the reasons discussed herein, the defendant's Motion for Summary Judgment and the plaintiff's Motion *in Limine* will be denied.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

---

[8] In a passing argument, the plaintiff points to the language of *Perkins*, which stated that "the owner of a vehicle . . . may recover for the loss of its use . . . while being repaired." 132 Tenn. at 298. The defendant argues that, because there was no repair during the loss of use period, the plaintiff is not entitled to recover. (Docket No. 29 at 20.) This argument is without merit. The rationales that permit recovery for loss of use have no connection to the timing of the repair.