IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | |
|---|---|
| LEVEL 3 COMMUNICATIONS, LLC,<br><br>    Plaintiff<br><br>v.<br><br>MICHAEL R. FLOYD, d/b/a FLOYD & FLOYD CONTRACTORS,<br><br>    Defendant. | Case No.: 1:09-cv-0082<br>JURY DEMAND (12)<br><br>Judge Trauger |

## WALT KELLY DIRECT EXPERT TESTIMONY

## SUMMARY OF PERTINENT FACTS

Pursuant to a contract dated July 20, 2006, Floyd, who was referred to as the "Contractor," agreed, to perform certain work for the development of a subdivision in Columbia, Tennessee known as Arden Village for a price of $2.987 million dollars. The contract required Floyd to perform all of its work in the manner set forth in the project drawings.

Michael Floyd, the owner of the company, and Floyd's foreman in charge of this project, Anthony Howell, have acknowledged that the drawings the developer provided to Floyd for the project showed that the Level 3 conduit bank and cable that Floyd eventually hit and damaged ran along the west side of Highway 31. Michael Floyd and Howell, have also acknowledged that they knew from the drawings that Floyd would have to dig directly across that Level 3 conduit bank and cable to install water and sewer lines.

The project drawings instructed Floyd numerous times that Floyd was responsible for locating and verifying the exact depth of all existing utility lines Floyd would have to cross; Floyd was responsible for performing its work in such a way that it would avoid possible damage to those existing utility lines, including hand-digging where needed, and Floyd was responsible for

relocating any existing utility lines which were in conflict with any of the work shown in the drawings. For example, Sheet C-1 of the project drawings included the following requirements:

> The general contractor shall take all necessary precautions to avoid damage to adjacent properties during the construction. The contractor will be held solely responsible for any damages to adjacent properties occurring during the construction of the project.
>
> The general contractor shall be solely and completely responsible for job site conditions, including the safety of all persons and property during construction.
>
> The contractor shall call the Tennessee One Call and/or the appropriate utility company at least 48 hours prior to any excavation and request field verification of utility locations. It shall be the contractor's responsibility to relocate existing utilities conflicting with improvements shown hereon in accordance with all local, state and federal regulations concerning such operations.
>
> Before installation of storm or sanitary sewer, the contractor shall excavate and verify all crossings.

Sheet C-7 of the project drawings contained the following requirement:

> The contractor shall verify locations of all existing utilities (including storm drainage pipes or structures) before commencement of construction.

Sheet C-16 of the project drawings contained the following requirements:

> The contractor shall be responsible for locating and verifying the elevations of existing utilities prior to beginning construction.
>
> In areas where it is necessary that the exact locations be known of underground utilities, the contractor shall, at his own expense, furnish all labor and tools necessary to either verify and substantiate or definitely establish the position of underground utility lines.

Sheet L-1 of the project drawings contained the following requirement:

> Determine locations of underground utilities and perform work in a manner which will avoid possible damage. Hand excavate as required.

On June 11, 2007, Floyd provided notice to the Tennessee One-Call Center that it intended to excavate along the west side of Highway 31 in front of the Arden Village project. The One-Call

Center is the organization formed pursuant to Tennessee's Underground Utility Damage Prevention Act, which is also known as the One-Call law, to receive notices from contractors when they intend to excavate. When the One-Call Center receives such a notice, the One-Call Center, in turn, notifies the utilities with underground facilities in the excavation area. The purpose of this notice requirement is to enable utilities to mark the location of their facilities so the excavator can then take the other precautions Tennessee law, federal regulations and reasonable and accepted industry practices require to avoid damaging those underground facilities.

Michael Floyd has admitted that while he knew that Tennessee's One-Call law required Floyd to call the Tennessee One-Call Center, he had not actually read the law and did not know what other precautions it required Floyd to take when excavating around underground utilities. He did not know whether Howell, the foreman Floyd had placed in charge of the job, had read the law and had never asked Howell to do so. Michael Floyd has also admitted that he was not familiar with any of the reasonable and accepted industry standards and practices for excavating safely around underground utilities. Finally, Michael Floyd admitted that the company provided no training regarding excavating safely around underground utilities to the employee who was operating the trackhoe when it struck and damaged Level 3's conduits and cable.

Howell has similarly admitted that, while he knew that Tennessee's One-Call law required Floyd to call the Tennessee One-Call Center, he, too, did not know what other precautions Tennessee law required Floyd to take when excavating around underground utilities.

In this area, Level 3 had an underground conduit bank which consisted of 12 separate plastic conduits. Level 3 also had a fiber-optic cable with 96 separate fibers in one of those conduits. On or about June 12, 2007, as required by Tennessee law, Level 3 marked the location of its conduit bank and its cable in this area with orange paint marks and orange flags.

On July 16, 2007, Floyd again provided notice to the Tennessee One-Call Center that it intended to excavate along the west side of Highway 31 in front of the Arden Village project. On or about July 18, 2007, as required by Tennessee law, Level 3 again marked the location of its conduit bank and its cable in this area with orange paint marks and orange flags. Both Michael Floyd and Howell acknowledged that they saw the flags marking the location of Level 3's conduit bank and cable.

On Tuesday, August 14, 2007, Allen Hannah and Jeff North of Level 3 met with Floyd's foreman, Anthony Howell, at the project site. Hannah and North walked the route of the conduit bank and the cable with Howell and placed orange paint marks and orange flags over the conduit bank and the cable at 10-foot intervals to show the location of the conduit bank and the cable. Hannah and North also placed marks at 10-foot intervals on the pavement adjacent to the conduit bank and the cable which showed the approximate depth of the cable. They discussed the fact that Floyd intended to install the storm drain piping which ran across Level 3's conduit bank and cable at a depth of four feet six inches and that this was the same depth as the conduit bank and the cable. Hannah and North informed Howell that approximately 75 feet of the conduit bank and the cable would therefore have to be lowered to accommodate the storm drain lines Floyd intended to install to avoid this conflict. Hannah and North also requested that Floyd call Level 3 before Floyd did any digging near Level 3's conduit bank and cable so that Level 3 could be present to protect Level 3's conduit bank and cable during such excavation.

Howell promised Hannah and North that Floyd would not excavate in this area until Level 3 had lowered its conduit bank. Howell also promised that Floyd would call Level 3 before Floyd did any digging near Level 3's conduit bank and cable. After securing these promises from Howell, Hannah and North left the site.

On the next morning, Wednesday, August 15, 2007, Hannah was driving by the Arden Village project site on his way to a meeting at another site. Hannah observed Floyd personnel excavating with a trackhoe in the area of Level 3's conduit bank and cable. When he stopped to investigate, Hannah observed that the despite the promises Howell had made the previous day, Floyd had excavated with the 36-inch trackhoe bucket directly over the paint marks and flags indicating the location of Level 3's conduit bank and cable.

Hannah also observed that Floyd had excavated through orange plastic warning tape Level 3 had placed in the ground above the conduit bank and the cable when Level 3 had originally installed the conduit bank and the cable. The purpose of such warning tape is to warn an excavator when he is approaching an underground utility so that he can stop excavating before he damages the underground facility.

The ends of the orange plastic warning tape Floyd dug through can be seen sticking out from the banks on either side of the trench Floyd was digging across the conduit bank and the cable in photographs taken by Level 3. These photographs are a part of Plaintiff's Exhibit P-16.

> Photograph Number 0583 is taken looking west toward the Arden Village project area. One of the ends of the severed warning tape can be seen sticking out from the north bank of the trench in the upper right hand portion of the photo.
>
> Photograph Number 0584 is taken looking east from the Arden Village project area toward Highway 31. The ends of the severed warning tape can be seen sticking out from the north bank of the trench, or middle left side of the photo, and from the south bank of the trench, or upper right side of the photo.
>
> Photograph Number 0585 is also taken looking east from the Arden Village project area toward Highway 31. One of the ends of the severed warning tape can be seen sticking out of the north bank, or left side, of the trench.

Finally, Hannah observed that Floyd had struck and kinked or crushed a number of Level 3's conduits, including the conduit containing Level 3's cable, with the trackhoe bucket.

Howell has acknowledged that Floyd struck the conduits with the trackhoe bucket. Howell has further acknowledged that upon seeing that Floyd had struck and kinked Level 3's conduit bank, Floyd did not stop and notify either the Tennessee One-Call center or Level 3 of the damage. Rather, Floyd kept digging with the trackhoe until Hannah arrived at the site and told Floyd to stop.

Hannah questioned Howell as to why Floyd had, despite the promises Howell had made on the previous day, excavated directly over Level 3's conduit bank and cable. Howell responded that he had been doing this type of work for many years, that he knew what he was doing, and that Floyd had to get this job done.

Level 3's alarms did not indicate any interruption in traffic at that time. Hannah did, however, inform Howell that Level 3 needed to repair the damaged conduits and instructed Howell to cease work in the area until that was done. Hannah then left to go to that other appointment. When Hannah left, the exposed conduits, including the one containing the cable, were resting on, and supported by, earth and rock beneath the conduits.

On Thursday, August 16, 2007, at 12:24 p.m. Central Daylight Time, Level 3's alarms sounded, indicating an interruption in service on the cable. Level 3 isolated the interruption to the point where Floyd had struck the conduits and the cable on the previous day. At this time, neither Level 3 nor its contractors had returned to the project site or initiated any repair of the damage Floyd had inflicted on the conduits and the cable on August 15, 2007.

Hannah and other Level 3 personnel arrived at the project site at approximately 3:30 to 4:00 p.m. Central Daylight Time. According to Hannah, they observed that more excavation had been done after Hannah had left the site the previous day. Additional rock and earth had been excavated from under the conduits and the cable, leaving them unsupported and hanging in midair. The ditch Floyd had been excavating over the conduits and the cable when Hannah arrived on

6

August 15, 2007 had been extended further to the west from Highway 31 or into the Arden Village property.

Floyd has denied that it excavated over, or struck, the conduits or the cable on August 16, 2007. However, Howell has admitted that Floyd was the only contractor working at the project site on that day.

## OPINIONS AND THEIR BASES

Based on these facts, my experience and training, my knowledge of the Tennessee One-Call law, federal regulations and reasonable and accepted industry standards and practices, Floyd failed to use ordinary or reasonable care. Floyd did things a reasonably careful person would not do and failed to do things that a reasonably careful person would do under all of the circumstances in this case. Specifically:

**1. Floyd failed to meet the requirements of Tennessee's One-Call law and reasonable and accepted industry standards and practices when it failed to plan its excavation to avoid damage to Level 3's facilities.**

Tennessee's One-Call law, specifically § 65-31-110 (1), required Floyd to:

> Plan the excavation or demolition to avoid damage to and minimize interference with underground utilities in and near the construction area.

Floyd failed to do so. In addition to this provision of the Tennessee One-Call law, Floyd also failed to comply with reasonable and accepted industry standards and practices.

In 1998, the U.S. Congress enacted the Transportation Equity Act for the 21st Century. I will refer to it as the TEA 21. In enacting the TEA 21, Congress specifically found that damage to underground facilities during excavation is a significant cause of disruptions in telecommunications and other vital public services. The TEA 21 directed the Secretary of Transportation, in consultation with other appropriate federal agencies, state agencies, one-call centers, underground

facility operators, excavators and other interested parties, to perform a study of damage prevention practices. The purpose of this study was to gather information and to identify and validate existing best practices for preventing damage to underground utility facilities.

In August 1999, the Common Ground Alliance, which is commonly referred to as the CGA, published the Common Ground Study as required by the TEA 21. The CGA was made up of over 160 individuals who represented a wide range of interests, organizations and viewpoints concerning the prevention of damage to underground facilities, including excavation contractors and their trade organizations.

The Excavation Task Team was one of the CGA teams which participated in and prepared the Common Ground Study. The Excavation Task Team included representatives from the Associated General Contractors of America, a construction trade association. The Excavation Task Team's mission was to identify and describe safe "best practices" to reduce or prevent damages during excavation around buried utility facilities. The Excavation Task Team reviewed various state One-Call laws, federal regulations, industry standards, company practices and company guidelines and operating practices. Among the specific sources the Excavation Task Team reviewed in identifying existing best practices were the federal regulations regarding excavation in the vicinity of underground facilities set forth in 29 C.F.R. § 1926.651, guidelines developed by CNA Insurance Company, and TIA/EIA Standard 590-A.

To be considered a "best practice" for preventing damage to underground utility facilities, the practice had to meet three criteria. First, the practice had to be an actual activity that was being used and could be documented. Second, the practice had to be practical and cost effective with current technology. Third, the practice had to be considered reasonable by the majority of the people that would be asked to implement the practice. All CGA "best practices" were determined by a "consensus process." This consensus process required that the task team recommending the

practice reach 100% agreement regarding the practice. The best practices the CGA adopted include both a statement of what the best practice is and a description of how that best practice works.

The CGA developed Best Practice 5.6.2(15) regarding facility avoidance. This best practice provides:

> **Practice Statement**: The excavator uses reasonable care to avoid damaging underground facilities. The excavator plans the excavation so as to avoid damage or minimize interference with the under ground facilities in or near the work area.
>
> **Practice Description**: Foremost on any construction project is safety. Excavators using caution around underground facilities significantly contribute to safe excavation of existing facilities.

Floyd did provide notice to the Tennessee One-Call Center. However, Floyd did not plan its work or use reasonable care to avoid damaging Level 3's conduit bank and cable when Floyd actually began excavating. Rather, Floyd excavated with a trackhoe directly over Level 3's marked conduit bank and cable and struck them with the 36-inch bucket of the trackhoe.

**2.     Floyd failed to meet the requirements of Tennessee's One-Call law and reasonable and accepted industry standards practices when it did not follow the agreement it made with Level 3 on August 14, 2007 to notify Level 3 before Floyd began excavating near Level 3's conduit bank and cable.**

If, as here, the excavator's work will conflict with existing utilities, Tennessee's One-Call law, specifically § 65-31-108 (f) required Floyd to notify Level 3, the operator of the existing utility, and:

> [R]easonably cooperate with the operator of the underground utility facilities to conduct its excavation or demolition in such a way that the operations of the underground utility facilities are not disturbed or the affected underground utility facilities are placed out of the way of the proposed excavation or demolition.

In formulating its Best Practices, the CGA relied on standards propounded by the National Utility Locating Contractors Association, which is also known as NULCA, and CNA Insurance Company. NULCA and CNA's standards provide that if there is a critical or high priority facility such as Level 3's fiber-optic telecommunications line in a dig area, the excavator should arrange for the facility owner to be on the job site with the excavator during the excavation.

In May of 2003, the Department of Labor issued a Health and Safety Bulletin which was based on recommendations of the National Transportation Safety Board, or NTSB, made after investigating an incident of excavation damage to an underground pipeline. In that Safety Bulletin, the Department of Labor concluded that excavators need to contact and coordinate with the utility companies to establish the locations of all utilities and to take all necessary precautions to avoid damaging underground utility installations.

Contrary to this provision of Tennessee's One-Call law and these reasonable and accepted industry standards and practices, Floyd did not notify Level 3 or wait for Level 3 to be present before Floyd excavated on August 15, 2007 with a trackhoe directly over the marked and flagged location of Level 3's conduit bank and cable.

3. **Floyd failed to meet the requirements of Tennessee's One-Call law, federal regulations, and reasonable and accepted industry standards and practices if Floyd did not expose the Level 3 facilities by safe and acceptable means prior to excavating directly over them with a trackhoe.**

Exposure of an underground facility by safe and acceptable means to determine its precise location and depth so that damage can be avoided is a cornerstone of damage prevention. Once the excavator has given notice and the operator has marked its facilities, an excavator cannot dig with mechanized equipment like a trackhoe until it has exposed the facility by hand-digging or other safe and acceptable soft-digging techniques.

Tennessee's One-Call law, specifically § 65-31-108(c), establishes a "safety zone" which extends two feet out from either side of an underground utility:

> An excavator shall exercise reasonable care to avoid damage caused by an excavation or demolition within the safety zone around the marked location of the underground utilities. For the purpose of this section, "safety zone" means a strip of land at least four feet (4′) wide, but not wider than the width of the utility plus two feet (2′) on either side of the utility.

The safety zone, which is also referred to as a "tolerance zone" is illustrated by this diagram. If the facility is only a single cable or line, the safety zone extends out two feet from either side of the cable or line. If the facility consists of a conduit bank like the one Level 3 had installed here, the safety zone extends out two feet from either side of the outside edges of the conduit bank.

Tennessee's One-Call law, specifically § 65-31-1-8(f), provides that a utility owner such as Level 3 mark the location of its facility with paint marks or flags:

> The approximate location of underground utilities does not include a designation of location as to depth below the surface of the ground. Excavators must use reasonable care to ascertain for themselves the exact depth of the underground utilities below the surface of the ground.

The federal regulations on which the CGA relied in forming its best practices require an excavator to:

> First determine the estimated location of utility installations, such as sewer, telephone, fuel, electric, water lines, or any other underground installations that reasonably may be expected to be encountered during excavation work, shall be determined prior to beginning any excavation.
>
> When the excavation operations approach the estimated location of underground installations, the exact location of the installations shall be determined by safe and acceptable means.

CGA Best Practice 5.6.3(20) regarding excavation in the tolerance zone provides that:

> **Practice Statement**: When excavation is to take place within the specified tolerance zone, the excavator exercises such reasonable care as may be necessary for the protection of any underground facility in or near the excavation area. Methods to consider, based on certain

11

climate or geographical conditions, include: hand digging when practical (pot holing), soft digging, vacuum excavation methods, pneumatic hand tools, other mechanical methods with the approval of the facility owner/operator, or other technical methods that may be developed.

**Practice Description:** Safe, prudent, non-invasive methods that manually determine a facility are considered "safe excavation practices" in a majority of state laws (38 states). A majority of states outline safe excavation practices to include hand digging or pot holing (16 states). Some states specifically allow for the use of power excavating equipment for the removal of pavement. Each state must take differing geologic conditions and weather related factors into consideration when recommending types of excavation within the tolerance zone.

TIA/EIA Standard 590-A was formulated in response to the contracting industry's concern regarding the difficulty of determining and verifying the presence and location of underground fiber-optic cable facilities and the impact of cable cuts. Its purpose is to develop protective measures to reduce the probability of damage resulting from excavation in the vicinity of fiber-optic cables. Section 4.10.3.5 of TIA/EIA Standard 590-A provides:

> The excavator should use hand or nondestructive tools within the tolerance or safety zone to expose the facility.

The NULCA and CNA Insurance Company standards on which the CGA relied when adopting its best practices similarly provide that if an excavator does, as Floyd did here, use mechanical equipment within 24 inches of the marks or flags a utility operator has placed to indicate the location of its underground facilities, the excavator should expose the line by hand-digging. This is consistent with the requirement on Sheet L-1 of the project plans which required Floyd to hand-excavate.

Here, Floyd's striking Level 3's conduit bank and cable with the 36-inch bucket of the trackhoe after having already dug through and severed the plastic warning tape above the conduit

12
Case 1:09-cv-00082 Document 70 Filed 03/15/11 Page 12 of 19 PageID #: 1521

bank and cable is not consistent with Floyd's having first exposed the conduit bank and the cable and determined their exact location and depth by hand-digging or other safe and acceptable means.

4.   **Floyd failed to meet the requirements of Tennessee's One-Call law when it failed to maintain a clearance between Level 3's conduit bank and cable.**

Tennessee's One-Call law, specifically § 65-31-110(2), required Floyd to:

> Maintain a clearance between an underground utility and the cutting edge or point of any mechanized equipment in accordance with § 65-31-108(b) and (d), taking into account the known limit of control of such cutting edge or point, as may be reasonably necessary to avoid damage to such utility.

Floyd struck and damaged Level 3's conduit bank with the 36-inch bucket of its trackhoe. Floyd therefore violated this provision of Tennessee's One-Call law.

The fact that Floyd struck the conduit bank and the cable with the 36-inch bucket of the trackhoe shows that Floyd did not maintain the necessary clearance between Level 3's conduit bank and cable and the cutting edge or point of the trackhoe.

5.   **Floyd failed to meet the requirements of Tennessee's One-Call law, federal regulations, and reasonable and accepted industry standards and practices even if it did expose the Level 3 facilities prior to excavating, but still struck the facilities with excavation equipment.**

Tennessee's One-Call law, specifically § 65-31-110(3), required Floyd to:

> Provide such support and protection for underground utilities in and near the construction area, including during backfill operations, as may be reasonably necessary.

The federal regulations on which the CGA relied in adopting its best practices provide that:

> While the excavation is open, underground installations shall be protected, supported, and removed as necessary to safeguard employees.

CGA Best Practice 5.6.3(22) regarding the protection of exposed facilities provide:

13

> **Practice Statement**: Excavators support and protect exposed underground facilities from damage.
>
> **Practice Description**: Protection of exposed underground facilities is as important as preventing damage to the facility when digging around the utility. Protecting exposed underground facilities helps to insure that the utility is not damaged and at the same time protect employees working in the vicinity of the exposed facility.
>
> Exposed facilities can shift, separate, or be damaged when they are no longer supported or protected by the soil around them from moving or shifting which could result in damage to the facility. … In addition, workers are instructed not to climb on, strike, or attempt to move exposed facilities which could damage protective coatings, bend conduit, separate pipe joints, damage cable insulation, damage fiber optics, or in some way affect the integrity of the facility.

Even if Floyd had first exposed Level 3's conduit bank and the cable hand-digging or other safe and acceptable means, the fact Floyd still struck Level 3's conduit bank and cable with the 36-inch bucket of the trackhoe shows Floyd did not use reasonable care to protect the conduit bank and the cable once they had been exposed.

6. **Floyd failed to meet the requirements of Tennessee's One-Call law and reasonable and accepted industry standards practices when it failed to notify Level 3 and kept digging after it hit and damaged Level 3's conduit bank with the bucket of its trackhoe.**

Tennessee's One-Call law, specifically § 65-31-111 (a) provides that:

> Except as provided by subsection (b), each person responsible for any excavation or demolition operation described in § 65-31-104 that results in any damage to an underground utility shall, immediately upon discovery of such damage, notify the operator of such utility of the location and nature of the damage and shall allow the operator reasonable time to accomplish necessary repairs before completing the excavation or demolition in the immediate area of such utility.

CGA Best Practice 5.6.3(24) sets forth the following procedures and excavator should follow after damaging an underground utility facility:

> **Practice Statement**: An excavator discovering or causing damage to underground facilities notifies the facility owner/operator and the one-call center. All breaks, leaks, nicks, dents, gouges, grooves, or other

damages to facility lines, conduits, coatings or cathodic protection will be reported.

**Practice Description:** A majority of states require notification for damage or substantial weakening of an underground facility (27 states). The possibility of facility failure or endangerment of the surrounding population dramatically increases when a facility has been damaged. While the facility may not immediately fail, the underground facility owner/operator should have the opportunity to inspect the damage and make appropriate repairs.

Section 4.10.3.7 of TIA/EIA 590-A provides that:

The excavator should immediately report discovery of a damaged facility, or if it is otherwise at risk of failure, to the owner.

The standards for safe excavation promulgated by NULCA and CNA Insurance Company similarly provide that all damages, however slight, including kinking or sheath damage must be reported immediately to a supervisor and to the facility owner or operator.

Floyd's foreman, Howell acknowledged that when Floyd saw that it had struck and kinked Level 3's conduit bank, Floyd did not stop and notify either the Tennessee One-Call center or Level 3 of the damage. Rather, Floyd kept digging with the trackhoe until Hannah arrived at the site and told Floyd to stop.

**7.** **Floyd failed to meet the requirements of reasonable and accepted industry standards and practices when it failed to be knowledgeable about, failed to train its personnel regarding, and failed to follow, all applicable statutes, regulations and reasonable and accepted industry standards and practices for excavating safely around underground utilities.**

CGA Best Practice 5.6.3(16) addresses the need for an excavator to ensure that its employees are properly trained regarding procedures for protecting underground utilities:

**Practice Statement**: The excavator adheres to all applicable federal and state/provincial safety regulations, which includes training as it relates to the protection of underground facilities.

15

> **Practice Description:** Although most existing state damage prevention legislation does not include reference to federal and state regulations, it is important to include reference to worker safety training in the best practices. Excavators are required to comply with federal and state occupational safety and health requirements to protect employees from injury and illness. These regulations include reference to training each employee in how to recognize and avoid unsafe conditions and the regulations applicable to his/her work environment to control or eliminate any hazards or exposures to illness or injury. Therefore, the excavator's crew, as part of its safety training, is informed of the best practices and regulations applicable to the protection of underground facilities.

The drafters of TIA/EIA 590-A felt this issue was so important that they addressed it twice when they compiled their standards. In § 4.10.3.9 they stated that:

> Excavators should comply with all other applicable OSHA, state, and local codes and regulations, and accepted industry practices.

In § 4.10.1.1 they not only reiterated that:

> Facility owners and excavators should be knowledgeable about the specific laws and regulations governing damage prevention methods and procedures for their operating areas,

they also stated that:

> If both parties follow not only the letter but the intent of such laws, it will minimize accidental damage to subsurface fiber optic cable facilities and thereby reduce liability exposure of the excavators, and service interruptions.

In 1997, the NTSB performed a Safety Study. The purpose of this Safety Study was to formalize recommendations for preventing damage to underground utilities during excavation. In this Safety Study, the NTSB concluded that excavators need to be trained and educated about safe work conditions, good excavation practices, relevant State laws, and one-call procedures  The NTSB further concluded that excavators should fully understand the one-call notification process: the meaning of facility markings, requirements for hand-digging near underground facilities.

In its May 2003 Safety Bulletin, the Department of Labor similarly concluded that Excavators need to establish a detailed work plan and train their employees on the proper procedures of determining the locations of underground utilities.

Despite this multitude of reasonable and accepted industry standards and practices, both Michael Floyd, the owner of the company, and Howell, the foreman on this project, have admitted they had not even read the Tennessee One-Call law. While Michael Floyd and Howell knew that the Tennessee One-Call law required Floyd to call the One-Call Center before excavating, neither knew what other precautions that law required Floyd to take when digging around underground utilities like Level 3's conduit bank and cables. Neither Michael Floyd nor Howell was familiar with any of the reasonable and accepted industry standards and practices an excavator should follow when digging around underground utilities. Michael Floyd also admitted that Floyd provided no training regarding the law or these safety practices to the foreman in charge of this job or to the employee who was operating the trackhoe when Floyd damaged Level 3's facilities.

On the very first page of the Common Ground Study, the CGA states: "At the heart of damage prevention is improved information accuracy and consistency in communication between excavators and operators of underground facilities. One-call systems provide a reliable and efficient process for excavators to notify facility owners/operators of planned excavations. The one-call process allows operators with facilities in the vicinity of a proposed excavation site to mark the location of their equipment and facilities in advance of the excavation. This gives excavators knowledge by which to excavate safely." This statement captures the essence of damage prevention and what Floyd failed to do here.

Floyd had multiple indications of the existence Level 3's conduit bank and cable in its work area. Floyd also had multiple indications of the danger excavating not only near, but in fact directly over, them posed to Level 3's conduit bank and the cable. There were the multiple warnings and

17

requirements in the project drawings Floyd received before it started the project. There were the initial markings of the conduit bank and the cable with orange paint and orange flags on June 12 and July 18, 2007. There were the orange paint marks and orange flags Al Hannah placed when he and Jeff North met with Howell on August 14, 2007. There were the verbal instructions from Hannah on August 14, 2007 that Level 3 would have to lower the conduit bank and the cable to avoid the conflict posed by the fact that Floyd needed to install the sewer lines at the exact same depth as Level 3's conduit bank and cable. There was Hannah's verbal request that Floyd contact Level 3 before excavating near Level 3's conduit bank and cable so that Level 3 could have someone present to protect the conduit bank and the cable from damage during such excavation. There was the warning tape above the conduits and the cable which Floyd dug through and ignored. There was Floyd's continuing to excavate around the conduit bank and the cable even after Floyd saw that it had struck and kinked several of the conduits with the bucket of the trackhoe.

In light of these facts and circumstances, Floyd did things a reasonably careful person would not do and failed to do things that a reasonably careful person would do under all of the circumstances in this case. Based on these facts and circumstances, my experience and training, my knowledge of the Tennessee One-Call law, federal regulations and reasonable and accepted industry standards and practices, I conclude that Floyd failed to use ordinary or reasonable care. I further conclude that Floyd was aware of, but consciously disregarded, a substantial and unjustifiable risk of damage to Level 3's conduit bank and cable and therefore acted recklessly.

My conclusion and opinions are to a substantial degree of certainty in my field.

Respectfully submitted,

    s/ James J. Proszek
James J. Proszek, *pro hac vice*
Brandon B. Rule, *pro hac vice*
**HALL, ESTILL, HARDWICK, GABLE,
GOLDEN & NELSON, P.C.**
320 South Boston Avenue, Suite 200
Tulsa, OK 74103-3706
Telephone (918) 594-0400
Facsimile (981) 594-0505

    and

John R. McCann
**BURCH, PORTER & JOHNSON, PLLC**
130 North Court Avenue
Memphis, TN 38103
Telephone (901) 524-5101
Facsimile (901) 524-5024

**ATTORNEYS FOR PLAINTIFF
LEVEL 3 COMMUNICATIONS, LLC**

**CERTIFICATE OF SERVICE**

On the 15th day of March, 2011, I electronically filed this document through the CM/ECF system, which will send a notice of electronic filing to:

    David A. Bates
    Creighton N. Fossett
    DUBOIS, DUBOIS & BATES, P.C.
    810 South Garden Street
    Columbia, TN 38402

    *dbates@duboislegal.com*
    *nfossett@duboislegal.com*

    s/ James J. Proszek

1214582.1:912444:01357