UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | |
|---|---|
| LEVEL 3 COMMUNICATIONS, LLC, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MICHAEL R. FLOYD d/b/a FLOYD & )<br>FLOYD CONTRACTORS, )<br>)<br>Defendant. ) | Case No. 1:09-0082<br>Judge Trauger |

## MEMORANDUM

On February 7, 2011, the court denied the defendant's Motion for Summary Judgment in this case in which the plaintiff, Level 3 Communications, LLC, a telecommunications provider, claims that the defendant, Michael R. Floyd, d/b/a Floyd & Floyd Contractors, trespassed on its telecommunications cable (the "Cable") and negligently damaged it during excavation work on a residential subdivision in Columbia, Tennessee on August 15-16, 2007. (Docket No. 40.) The court ruled that genuine issues of material fact precluded the court from finding in the defendant's favor on the issue of damage causation. (*Id.* at 6-14.) The court also found that the plaintiff could seek to recover "loss of use" damages in the amount (allegedly about $300,000) that it would have cost the plaintiff to rent substitute telecommunications capacity had the plaintiff not, prior to the accident, invested in spare, emergency capacity on its own network on which to "roll" traffic during the period that the damaged portion of the Cable was not in service. (*Id.* at 14-18.)

Now, five motions *in limine*, three on behalf of the plaintiff (Docket Nos. 46, 48, and 50)

1

and two on behalf of the defendant (Docket Nos. 53 and 55), have been filed by the parties in advance of the March 29, 2011 trial of this case. These motions have been fully briefed, and the court will address each one in turn.

I.      **Plaintiff's Motion *in Limine* Regarding Loss of Use Damages (Docket No. 46)**

As discussed in the court's summary judgment Memorandum, the plaintiff seeks the post-outage repair costs of the Cable and "loss of use" damages. (Docket No. 47 at 1.) In this motion, the plaintiff argues that, because it has "elect[ed] to measure loss of use damages by the rental cost of substitute property," the defendant should not be allowed to introduce evidence regarding (1) any compensation that Level 3 provided to its customers as a result of the service outage, (2) any costs to actually obtain substitute capacity, or (3) any out-of-pocket costs that Level 3 incurred as the result of the loss of use of the Cable. (*Id.* at 2.)

Level 3 argues that it is entitled to "elect which measures of recovery it chooses to pursue," and, here, it has elected to "measure its loss of use damages by the cost of renting substitute capacity," a damages theory that, even in the absence of the actual rental of substitute capacity or out-of-pocket costs, the court has deemed permissible in this case and other courts have likewise deemed permissible in similar cases. (*Id.* at 4-5 citing *Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901, 908 (Tenn. 1999) and collecting cases).

Because out-of-pocket costs are not required to prove "loss of use" damages under the plaintiff's theory, Level 3 argues, evidence of such costs (or the lack thereof) is irrelevant. (*Id.* at 5.) In support of this view, Level 3 offers a series of cases that recognize the plaintiff's loss of use theory and other non-controlling cases, most of which arise outside of the telecommunications context, in which the court ruled that a defendant could not introduce

2

evidence that was irrelevant to the plaintiff's damages theory. (*Id.* at 5-6 citing *e.g. Abramson v. Fl. Gas Transmission Co.*, 809 F. Supp. 1376, 1381 (E.D. La. 1995)).

The plaintiff does provide one case in which the court ruled that the defendant could not obtain discovery into the plaintiff/telecommunications company's loss of revenue during an outage because the plaintiff was proceeding under a similar loss of use theory. (*Id.* citing *MCI v. Von Behren*, 2002 WL 32166535, *1-2 (N.D. Ga. May 21, 2002)). Additionally, the plaintiff submits a May 21, 2009 Order from *Sprint Communications Co. v. Western Innovations, Inc.*, in which a District of Arizona court granted a similar motion *in limine*, as evidence of out-of-pocket costs was not probative of the core issue of whether the plaintiff had actually used spare capacity on its network during the outage. (Docket 47 Ex. A at 2.) Finally, the plaintiff argues that, even if nominally relevant, evidence concerning the lack of out-of-pocket expenses would confuse and mislead the jury, such that the evidence should be excluded under Federal Rule of Evidence 403. (Docket No. 47 at 11-13.)

In general, the defendant's response is overbroad, discussing issues of admissibility not raised by the plaintiff's motion, and, throughout much of its response, the defendant takes issue with the fact that the plaintiff is allowed to seek loss of use damages in this case at all, again maintaining that the plaintiff is seeking a "windfall" because, among other things, the plaintiff did not sustain any actual rental costs or incur out-of-pocket expenses. (*See* Docket No. 78 at 1-3, 6-8, 11-13.) The court already determined this issue in the summary judgment Memorandum, and continued argument on this point is unnecessary.

However, the defendant does correctly argue that, under Tennessee law, loss of use damages are measured by "reasonable compensation," and "reasonable rental cost" is only one

3

factor that the jury "may consider" when calculating reasonable compensation. (*Id.* at 5 citing T.P.I. Civil 14.43; *see also Tire Shredders, Inc. v. Erm-N. Cent, Inc.*, 15 S.W.3d 849, 855 (Tenn. Ct. App. 1999)). That is, the "jury must be free to consider all relevant facts" that go into evaluating what is "reasonable compensation," which here must include the fact that the plaintiff, while seeking $300,000 in loss of use damages, did not sustain any actual of out-of-pocket costs or actually rent substitute capacity. (*Id.* at 11.) It is only by knowing the "whole story," the defendant argues, that the jury can arrive at what "reasonable compensation" is in this case. (*Id.*)

It is well known but worth noting that "[r]elevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. "Evidence which is not relevant is not admissible." Fed. R. Evid. 402. Despite the fact that evidence is relevant, it may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

To the court, evidence that the plaintiff did not incur certain, perhaps typical, loss of use damages is not irrelevant to the jury's calculation of what constitutes "reasonable compensation" in this case. Indeed, if the court were to grant the plaintiff's motion and rule that the defendant cannot introduce evidence that the plaintiff did not incur out-of-pocket costs in connection with the outage, the jury would not receive anything resembling the complete picture in this case, which would be fundamentally unfair to the defendant.

Again, the plaintiff is entitled to argue that it pro-actively reserved space on its network for emergencies, which it used during this outage and, therefore, it is entitled to reasonable rental cost, about all of which the jury will be appropriately instructed. However, where the inquiry is as broad as what constitutes "reasonable compensation," the jury cannot be blinded to the fact that the plaintiff did not incur out-of-pocket costs in connection with the outage. Rather than being "confusing" under Rule 403, the introduction of this evidence is necessary for the jury to have a fair chance to decide what amounts to reasonable compensation here. Therefore, the plaintiff's motion will be denied.

**II.     Plaintiff's Motion *in Limine* to Exclude Certain Evidence, Testimony, and Opinions from Defendant's Purported Expert, Jozelle Patterson-Burwell (Docket No. 50) and Plaintiff's Motion *in Limine* to Exclude Certain Evidence, Testimony, and Opinions from Defendant's Purported Expert, Gregory R. Schuelke (Docket No. 48)**

In these two motions, the plaintiff has moved to exclude portions of the defendant's proposed expert testimony from Jozelle Patterson-Burwell and Gregory Schuelke under *Daubert* and Rule 403.

**A.     Basic *Daubert* Standard**

Federal Rule of Evidence 702 provides that, "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. In *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993), the Supreme Court identified

four non-exclusive factors that may be helpful to the court in assessing the relevance and reliability of expert testimony, that is, (1) whether a theory or technique can and has been tested; (2) whether the theory or technique has been subject to peer review and publication; (3) the known or potential error rate and the existence and maintenance of standards controlling the theory or technique's operation; and (4) the extent to which a known technique or theory has gained general acceptance within a relevant scientific community. *Id.* at 593-94.

In its "gate-keeping" role, a trial court must evaluate the relevance and reliability of all expert testimony, whether the testimony offered is "scientific" or not. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). That said, the *Daubert* factors do not constitute a "definitive checklist or test." *Id.* at 150. Indeed, the court's fundamental objective is to generally evaluate, based on whatever factors are important in the particular case, the relevancy and reliability of the testimony and not necessarily to explore factors that might not be relevant to a particular case, such as whether the expert's methods are subject to empirical testing. *Id*. at 151. That is, the court is to ensure that the proffered testimony is reliable and relevant and that the expert, whatever his field, "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

When expert testimony is primarily based on the experience that the proffered expert has gained through personal endeavors, the expert "must explain how that experience leads to the conclusion reached . . . and how that experience is reliably applied to the facts." *Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005) (internal quotation omitted). In light of all of this, the court's paramount consideration remains, as explicitly stated in Federal Rule of Evidence 702, whether the proffered testimony will assist the trier of fact. Fed. R. Evid. 702.

**B.      Jozelle Patterson-Burwell**

The defendant has offered Jozelle Patterson-Burwell as an expert to testify as to the flaws in Level 3's damages assessment. (Docket No. 51 Ex. C.) While she is currently a consultant, Patterson-Burwell has "25 years of contract management experience combined with 10 years of telecom operations experience." (*Id.* at 3.) From October 1998 to August 2008, Patterson-Burwell worked for PAETAC, a telecommunications provider, where she had "responsibility for managing a multi-facility region," overseeing "telephone central office operations," and facilitating "the construction, repair and production turn-up of our fiber optics plant operations." (*Id.*) Given this experience, Patterson-Burwell maintains, she is well qualified "to provide insight and opinion on this case," which involved damage to a fiber-optic cable (*Id.*)

Based upon her review of the record, Patterson-Burwell maintains that "Level 3 was able to switch traffic while repair/restoral activities were on-going," and, therefore, Level 3 did not incur any damages beyond direct repair cost, which she also calculates. (*Id.* at 5-7.) Moreover, she claims, "fiber cuts" are common in the telecommunications industry, and, where, as here, "the alleged damage did not affect service" and no customers submitted damage claims to Level 3, "no additional charges," beyond direct repair costs, should be assessed. (*Id.* at 7.)

The plaintiff does not challenge Patterson-Burwell's proposed testimony and calculations regarding repair costs. (*Id.* at 2.) Rather, the plaintiff argues that Patterson-Burwell "is not qualified to offer any opinions regarding Level 3's loss of use damages." (*Id.* at 6.) Indeed, the plaintiff maintains that any "expert" testimony regarding the proper measure/theory of damages in this case is inappropriate and irrelevant, as the court has already determined that the plaintiff may offer its "loss of use" damages theory to the jury, even without a showing of lost profits or

7

that substitute capacity was actually rented. (*Id.* at 8-13.) That is, this aspect of Patterson-Burwell's testimony amounts to an improper "legal conclusion" and should not be permitted. (*Id.*; *see also U.S. v. Zipkin*, 729 F.2d 384, 387 (6th Cir. 1984)(the expert may not instruct the jury on "applicable principles of law").

The defendant responds that Patterson-Burwell does not intend to offer "legal conclusions," but rather "expert testimony and opinion that Plaintiff did not incur any loss of use damages as a result of the alleged incident because there is no evidence of lost profits or extraordinary expenses." (Docket No. 79 at 10.) Using her "knowledge and experience in the telecommunications industry," Patterson-Burwell will, the defendant argues, offer a sum (presumably, zero) that "reasonably compensates Plaintiff for its loss of use," which is not a legal conclusion, but merely an expert opinion on the plaintiff's damages, which is appropriate under *Daubert* and Rule 403. (*Id.* at 11-13.)

As indicated above, the core premise of Patterson-Burwell's proposed testimony is that the plaintiff may not recover any damages besides repair costs because the "alleged damage did not affect service." (Docket No. 66 Ex.1 at 7.) The problem with this is that the court has already determined that the plaintiff may offer its loss-of-use/reasonable rental value theory to the jury, in spite of the recognized fact that the plaintiff did not incur additional costs in conjunction with the outage. Therefore, the plaintiff is correct that Patterson-Burwell would be instructing the jury (in the court's view, incorrectly) on the applicable law.

Therefore, Patterson-Burwell may not testify regarding the propriety of awarding loss-of-use damages in this case. As noted above, the defendant is entitled to show the jury the "complete picture" in this case and introduce evidence regarding the types of damage that the

8

plaintiff did not suffer. While Patterson-Burwell may still offer this testimony, this evidence would be best introduced through cross-examination of Level 3 witnesses. Again, the plaintiff does not object to Patterson-Burwell's offering expert testimony on the reasonable repair costs in this case, and she may offer expert testimony on that issue.[1]

**C.    Gregory Schuelke**

The defendant has also offered Gregory Schuelke as an expert to testify as to the flaws in Level 3's loss of use damages calculation. (Docket No. 49 Ex. C.) Schuelke is a certified public accountant with, as he puts it, "over 20 years of diverse financial experience providing services as both a consultant and as an expert financial witness," primarily for damage claims in the litigation, business, and insurance context. (*Id.* at 3.)

In his report, Schuelke offers three primary opinions: (1) damages in this case should not be measured in loss of use; (2) damages should be measured by lost profits, of which Level 3 has shown none; and (3) even if Level 3 was entitled to loss of use damages, those damages should be significantly restricted. (*Id.* at 5-6.)

Schuelke opines that the plaintiff should be seeking lost profits because litigants should be compensated by the amount necessary to make them "whole"; this, according to Schuelke, is

---

[1]The plaintiff otherwise objected to Patterson-Burwell's testimony because her deposition allegedly showed some unfamiliarity with how Level 3 routes its traffic and with the core facts of this case, including whether the outage was a "down hard" incident, in which service was completely disrupted. (Docket No. 51 at 6-7.) The defendant responded that these concerns went to the weight of her testimony, not the admissibility thereof, and the court agrees. (Docket No. 79 at 6.) Also, apparently without providing the deposition excerpts, the plaintiff filed objections to the defendant's deposition designations of Patterson Burwell's testimony. (Docket No. 72.) Given that the objections were all, at least in part, based on "legal conclusion" grounds, the court assumes that its findings here moot those objections. If this is not the case, the plaintiff should immediately furnish to chambers a copy of the Patterson-Burwell deposition so that the court may rule on the objections.

the "typical approach to seek[ing] recovery of any financial damages for a suspension of business operation." (*Id.* at 8-9.) Anything more than what is necessary to make the plaintiff whole, Schuelke maintains, is an improper "windfall." (*Id.*)

Moreover, according to Schuelke, the loss of use calculus employed by the plaintiff is flawed.[2] (*Id.* at 10.) Schuelke points out that the plaintiff, since the incident, has not been consistent as to the number of DS-3s it claims were affected or the number of customers impacted by the outage. Indeed, Level 3 originally submitted a demand to the defendant that claimed that only 2,208 DS-3s were impacted and that the loss of use damages were "only" $169,498.04. (Docket No. 49 Ex. C at 9.) Schuelke maintains that there is no apparent reason – besides litigation – for the upward revision. (*Id.*)

Further, Schuelke maintains, the "rates and fees submitted by Plaintiff for the theoretical rental are not substantiated by contract or prior usage experience." (*Id.* at 10.) Schuelke points out that AT&T also sustained damage in this incident, and it submitted a loss of use claim of $28,990.71, with its rate per damaged circuit significantly less than that sought by the plaintiff. (*Id.* at 11.) Schuelke concludes this section of his report with a detailed series of proposed revised loss of use calculations, which are based on a combination of AT&T's rates and the previously submitted, lower damage estimates provided by Level 3. (*Id.* at 11-12.)

In its motion, the plaintiff argues that Schuelke is not qualified "to offer any opinions

---

[2]To review, the plaintiff bases its loss of use calculation "on the reasonable rental cost of procuring comparable capacity from another carrier to replace the [] circuits that were actually carrying traffic when Floyd severed the traffic-bearing cable." (Docket No. 51 at 2.) To determine what that cost would have been, the plaintiff took the price per unit of capacity on the circuit (known as a DS-3) charged by BellSouth and Verizon and then multiplied that "by the number of active DS-3s [4,032] and the number of hours [2.9] it took to complete the temporary repair of the active cable." (*Id.*)

regarding Level 3's loss of use damages." (Docket No. 49 at 6.) As with Patterson-Burwell, the plaintiff argues that Schuelke's proposed testimony regarding the impropriety of loss-of-use damages in this case and the windfall nature of "loss of use" damages are improper legal conclusions that should not be permitted at trial. (*Id.* at 10-15.) In response, the defendant argues that Schuelke merely used "accounting principles" to determine that, with commercial property, "the measure of loss is typically lost profits," and, because the plaintiff did not suffer any lost profits here, there are no damages and any additional recovery would be a windfall. (Docket No. 80 at 16-17.)

As discussed above in the context of Patterson-Burwell's testimony, the proposed testimony regarding the propriety of loss of use damages amounts to the proposed expert (incorrectly) providing the jury with the applicable law; therefore, Schuelke's proposed testimony on the propriety of loss of use damages will not be permitted. In terms of substantive testimony, the only remaining issue appears to be whether Schuelke may testify regarding the flaws in the plaintiff's loss of use calculation and provide alternative damage assessments.[3]

On this point, the plaintiff maintains that Schuelke's deposition reveals that he has a minuscule understanding of the telecommunications industry. That is, among other things, the plaintiff argues that Schuelke does not understand the nuances of how telecommunications companies handle traffic, how certain traffic is priced, the type of circuits used in the Cable, or how long it would actually take to "roll" service from the damaged part of the Cable. (Docket

---

[3] Again, under the circumstances here, while Schuelke could presumably still offer testimony regarding the damages that the plaintiff did not suffer, the court suggests that the most appropriate method for the defendant to introduce evidence regarding the damages that the plaintiff did not incur would be through cross-examination of Level 3 witnesses.

No. at 6-9.)

Moreover, while Schuelke submitted revised calculations based upon AT&T's rates, he conceded that he "made no attempt to analyze the DS-3 prices from BellSouth and Verizon which Level 3 used in its calculation." (*Id.* at 8.) Also, as revealed in Schuelke's deposition, he has no understanding as to how AT&T sets its rates or whether those rates are consistent with any sort of industry standard. (*Id.* at 9.) In sum, the plaintiff argues, "Schuelke insists that Level 3 is limited to recovering loss of use damages calculated using rates he cannot describe." (*Id.*)

In response, after restating Schuelke's qualifications, the defendant argues that the plaintiff has overstated Schuelke's ignorance of the telecommunications industry, and, while Schuelke is clearly not an expert in the industry, it is still well within his field of expertise to "review and evaluate plaintiff's loss of use claim pursuant to proper accounting and forensic accounting principles and methodologies," which is precisely what Schuelke has done in analyzing the changing nature of the plaintiff's damage demand, exploring the substantive basis (if any) for the assumptions underlying the plaintiff's calculation, and in preparing the alternative damage models. (Docket No. 80 at 15-19.)

The court can detect little reason why Schuelke should not be permitted to offer these alternative damage calculations and challenges to the plaintiff's calculations. It appears undisputed that Schuelke is an experienced accountant with specific in-depth experience in damages modeling. While he may not be particularly familiar with the telecommunications industry, the defendant is correct that incredibly detailed knowledge of that industry does not appear necessary in order to employ accounting principles and models to generate an alternative damages calculation. Of course, the plaintiff may challenge Schuelke's calculations and argue

that they are incorrect, due to Schuelke's ignorance of the industry, but the plaintiff has failed to show that Schuelke is not qualified to offer these alternative calculations and challenges to the plaintiff's damage calculations. Therefore, the plaintiff's motion will be granted in part and denied in part, as discussed above.

**IV.     Defendant's Motion *in Limine* to Exclude Opinion Testimony Regarding Causation (Docket No. 53)**

As discussed in the February 7, 2011 Memorandum, the initial observed strike of the Cable on August 15, 2007 did not cause an immediate service outage. Rather, the service outage occurred the next day, because, the plaintiff argues, the defendant continued working around the site. (Docket No. 40 at 3-4.) At the summary judgment stage, the plaintiff sufficiently supported this theory through the on-scene, post-outage observation of Level 3 employee Allen Hannah. (*Id.*) However, as discussed in the Memorandum, the plaintiff also offered an alternative theory for the outage:

> [T]he plaintiff theorizes the initial strike on August 15, 2007 could have fractured or shattered glass within the Cable, leading to subsequent degradation and loss of signal the next day, much like a chip on a windshield slowly develops into a full-blown crack. In support of this view, the plaintiff largely relies on Hannah's deposition testimony, in which he suggested that, based upon his professional experience, once the cable is kinked, the glass within the cable is liable to react in a variety of different ways, depending on the degree of the glass fracture and environmental stressors. While Hannah conceded that he did not know the exact pressures at which the glass would react in a certain way, he maintained that it was entirely plausible that fractures in the glass could worsen over time, resulting in service disruptions.

(*Id.* at 7-8)(internal citation and quotation omitted)

The court ruled that Hannah could not offer this testimony, because "how glass fibers within a fiber-optic cable respond to certain impacts, temperature and other stressors . . . is expert testimony, as it involves knowledge well beyond that of the average layperson." (*Id.* at 12-13.) As Hannah was not offered as an expert, the court determined that his testimony on this

13

issue could not be used to advance the plaintiff's case at the summary judgment stage. (*Id.*) In this brief motion, which the defendant purports to bring "out of an abundance of caution," the defendant seeks an Order expressly prohibiting the plaintiff from introducing any testimony regarding its "delay of damage" theory. (Docket No. 54 at 2.)

In response, the plaintiff recognizes the court's previous ruling on this issue but argues that "Hannah and other Level 3 witnesses may testify regarding their personal knowledge and observations of the behavior of other damaged fiber-optic cables in similar circumstances"; that is, they should be able to testify, without attempting to offer a scientific explanation, to other similar occasions where a struck cable has "continue[d] to transmit traffic for a period of time" before later dropping traffic. (Docket No. 69 at 1-2.) So limited, this appears to be appropriate and, depending on the specific testimony, relevant lay witness testimony under Federal Rule of Evidence 701. However, Hannah and other witnesses will be walking a fine line in this area, and the court will ensure at trial that this testimony does not cross the line from lay to expert. For the moment, however, the defendant's motion will be denied as moot.

V.  **Defendant's Motion *in Limine* to Exclude Loss of Use Damages or Order An Adverse Inference for Evidence Spoliation (Docket No. 55)**

Again, in this case, the plaintiff maintains that, even though it did not actually rent spare capacity during the service outage, it should be entitled to recover as if it did, largely because it had pro-actively reserved emergency space on its network on which traffic could be "rolled" during a service outage, which, the plaintiff maintains, is exactly what happened during the August 16, 2007 outage. (Docket No. 40 at 14.) In determining that the plaintiff could present its loss of use damages theory to the jury, the court recognized that:

> The propriety of awarding the significant loss-of-use damages that Level 3 seeks here is

an issue about which reasonable minds could differ. As Judge Nixon noted in *Corporate Air*, tort damages in this context are designed to compensate for losses actually suffered and here, facially, the plaintiff suffered no direct losses (other than the repair costs). However, as the Supreme Court recognized almost 80 years ago and as numerous district courts have recognized in the telecommunications context, it is important to take an expansive view of the concepts of "renting" or replacing capacity during a period of loss or injury. These courts recognize that a proactive business owner who takes care to ensure that the loss of the primary chattel will not result in a service disruption to customers should be entitled to the loss-of-use damages to which less proactive business owners are, unquestionably, entitled.

Here, Level 3 maintains, it paid for and reserved space on the Cable that allowed it to transmit data despite the injury to another part of the Cable. If it had not done so and had to go and rent substitute capacity, it would be entitled to that rental cost if it proved the defendant's negligence. Additionally, the defendant's alleged conduct left the plaintiff in a more vulnerable position, unable to respond to any other emergencies that could have developed on the line during the period of repair. Under *Brooklyn Eastern* and the subsequent telecommunications cases, the court concludes that this theory of damages recovery is not invalid as a matter of law, and, therefore, the jury should be free to consider "loss of use" in making its damage determination in this case
(Docket No. 40 at 17-18.)(internal citation and quotation omitted).[4]

This motion *in limine* features two arguments. First, the defendant generally "renews the objections" it previously made to the admissibility of loss-of-use evidence in this case and incorporates the arguments it made at the summary judgment stage. (Docket No. 56 at 1.) Again, the court has already ruled on this general admissibility issue in the Memorandum.

Second, "the Defendant objects to the admissibility of any evidence related to the Plaintiff's loss of use claim based upon the Plaintiff's failure to produce or otherwise preserve evidence of its actual usage and actual economic benefits from the personal property in

---

[4] While it makes little substantive difference, in the Memorandum, consistent with the defendant's argument, the court referred to the spare, emergency space as having been reserved on the non-damaged part of the Cable. As the plaintiff stated in summary judgment briefing and makes more clear here, the plaintiff maintains that the emergency space was reserved on its network, not on the Cable itself. (Docket No. 35 at 12-13.) As indicated by this motion, where the spare space was reserved seems to be a point of continuing confusion between the parties.

15

question." (*Id.* at 2.)  That is, despite repeated discovery requests, the plaintiff "has failed to produce a single record showing its actual prior use of the Cable [] in order for anyone to assess whether the Plaintiff's non-damaged fibers were truly reserved for emergencies, or whether the[y] . . . were simply vacant or dormant due to lack of business."  (*Id.* at 3-4.)

Indeed, in responding to discovery requests, the plaintiff has claimed that the information requested regarding the "daily volume of actual usage" on the Cable is not relevant and not in Level 3's possession.  (*Id.*)  The defendant argues that the evidence is crucial, given the court's focus on the "emergency" nature of the spare fibers in the Memorandum and because Tennessee cases, in considering loss of use damages, consider how the plaintiff used the chattel when assessing the degree of damage.  (Docket No. 56 at 6-7 citing *Perkins v. Brown*, 132 Tenn. 294 (Tenn. 1915); *Scott v. Houston*, 2010 WL 680984, *7 (Tenn. Ct. App. Feb. 26, 2010)(finding a plaintiff could recover a daily "loss of use" amount, even if no vehicle was rented, but only for days that she customarily drove the vehicle)).  Additionally, without any clear understanding that the spare capacity was actually reserved for emergencies, there is no way to competently evaluate "the reasonableness of the plaintiff's rental claim."  (Docket No. 56 at 7.)

In response, Level 3 points out that the defendant seeks usage/revenue information for the time period before the Cable was damaged, something that Level 3 does not maintain and would not be expected to maintain in anticipation of litigation.  (Docket No. 74 at 4-5.)  On the issue of using space for emergencies, Level 3 maintains that it "has never claimed that it reserves fibers on the cable Floyd damaged exclusively for use in emergencies.  Rather, Level 3 maintains dedicated, spare restoration capacity on its network for use exclusively in emergencies."  (*Id.* at 6.)  Level 3 maintains that it has disclosed documents showing that a certain volume of traffic

16

was completely interrupted during the incident and that this traffic "was rerouted to dedicated spare restoration capacity . . . which Level 3 reserves exclusively for use in emergencies." (*Id.* at 6-7.)

A party seeking sanctions for spoliation must show: (1) that the party having control over the evidence had an obligation to preserve the evidence at the time it was destroyed; (2) that the evidence was destroyed with a "culpable state of mind"; and (3) that the destroyed evidence was "relevant" to the claims and defenses of the parties. *Beaven v. U.S. Dept. of Justice*, 622 F.3d 540, 553 (6th Cir. 2010). In *Adkins v. Wolever*, 554 F.3d 650, 651 (6th Cir. 2009), the Sixth Circuit, sitting *en banc*, determined that, notwithstanding state spoliation sanction standards, the federal district court has "broad discretion to craft proper sanctions for spoliated evidence." The Sixth Circuit recognized that the failure to produce relevant evidence raises issues of fault and implicates the fairness of the proceeding. *Id.* at 652. Therefore, a proper spoliation sanction, which can range from dismissal of the case to an instruction that the jury "may infer a fact based on lost or destroyed evidence," will "serve both fairness and punitive functions." *Id.* at 652-53.

The court finds no basis for a spoliation sanction here. At most, it appears that the plaintiff, in discovery, objected to producing certain evidence regarding how the Cable was used because it did not view the evidence as relevant in light of the plaintiff's damages theory and because it did not maintain certain categories of evidence. There is simply no suggestion from the record that the plaintiff has destroyed evidence or withheld evidence in bad faith. Therefore, the defendant's motion will be denied.

## CONCLUSION

For the reasons discussed herein, the defendant may offer evidence regarding the types of damages that the plaintiff did not incur, the testimony of the defendant's experts will be significantly limited in accordance with the court's summary judgment ruling, Level 3 witnesses may offer circumscribed lay testimony regarding previous experience with "delayed" outages, and no spoliation sanction is appropriate.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge